## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **DARRYL BURTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:10cv1540 TCM** |
| | ) | |
| **ST. LOUIS BOARD OF POLICE** | ) | |
| **COMMISSIONERS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

Pending in this civil rights action are a summary judgment motion filed by defendants Christopher Gunter[1] and Thomas Wilder [Doc. 168] and a summary judgment motion filed by the remaining defendants:  the St. Louis Board of Police Commissioners ("the Board") and its members, Francis G. Slay, Michael L. Gerdine, Bettye Battle-Turner, and Richard H. Gray (hereinafter collectively referred to as "the Board members"); Donald Cummings; Stephen Hobbs; and Daniel Nichols [Doc. 170].  Also pending is a motion filed by plaintiff, Darryl Burton, to exclude certain disclosed evidence and discovery topics [Doc. 149] and a motion filed by all defendants to exclude expert testimony by Steven Mandell [Doc. 161]. The case is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

---

[1]Plaintiff states in his Response to Gunter's and Wilder's Statement of Uncontroverted Material Facts that he does not oppose Gunter's motion for summary judgment.  (See Pl. Resp. at 1 n.1, ECF No. 179-8.)

## Background

The Amended Complaint.  Plaintiff Darryl Burton alleges in his amended complaint that his false conviction for the June 4, 1984, murder of Donald Ball was overturned by a state circuit court judge on the grounds, inter alia, that he was innocent.  (Am. Compl. ¶¶ 1, 11, ECF No. 83.)  The real murderer is Jesse Watson.[2]  (Id. ¶ 14.)  Plaintiff's conviction was the result of "misconduct, including witness manipulation, cover-ups, and fabrication" by officers of the St. Louis Metropolitan Police Department ("SLPD").  (Id. ¶ 2.)  The SLPD officers "settle[d]" on Plaintiff after hearing that he was feuding with Ball over a woman.  (Id. ¶ 15.)  Cummings and Hobbs[3] allegedly suppressed eyewitness information about the shooter's hair and complexion, neither of which matched Plaintiff's, and Hobbs prepared a police report that misstated the witnesses' accounts.  (Id. ¶ 16.)  Another defendant, Wilder, covered up information that he had interviewed a witness, Samuel Coleman, and Coleman had informed him that he knew Plaintiff, was at the gas station where and when Ball was murdered, and the man he saw was of a "much lighter" complexion than Plaintiff.  (Id. ¶ 17.)  Hobbs prepared a false police report that misstated what Coleman said.  (Id.)  The only evidence implicating Plaintiff in Ball's murder was from Claudex Simmons and Eddie Walker.  (Id. ¶ 18.)  Both these men were recruited by Defendants and manipulated into falsely implicating Plaintiff.  (Id.)  Gunter, Hobbs, Nichols, and Herbert Riley[4] fabricated

---

[2]Watson is now deceased.  See **Burton v. Dormire**, 295 F.3d 839, 843 (8th Cir. 2002).

[3]Two other officers, John Rousin and Herbert Riley, were named as defendants; however, both died prior to the suit being filed and were dismissed without prejudice in February 2011. (Rousin died in 2005 and Riley died in 1996).

[4]See note 3, supra.

information that Simmons witnessed the shooting – he had not – and fed him information about the murder that he did not independently know.  (Id. ¶ 22.)  Additionally, during the trial, one or more of the individual officer Defendants prepared an eyewitness, Joan Williams, to testify by showing her Plaintiff's photograph and telling her that he was the defendant at the trial.  (Id. ¶ 24.)  Williams responded that the shooter was of a much lighter complexion than the man in the photograph and that they had the wrong man.  (Id. ¶ 25.)  Defendants suppressed her statements.  (Id. ¶ 26.)  The violation of Plaintiff's rights by the individual officer Defendants "resulted from certain improper customs and policies of the" Board, its failure to implement and its deliberate indifference to the need for policies and training, and its deliberate indifference and condonation of "the existence of a widespread practice and custom within the SLPD of improper witness identification procedures and of suppressing exculpatory and impeachment information from prosecutors and of intentionally destroying such evidence."  (Id. ¶ 31-33.)

Plaintiff alleges in Count I a cause of action under 42 U.S.C. § 1983 arising from the violation of his constitutional right to a fair trial by the suppression of exculpatory material; in Count II a § 1983 claim arising from that the improper and suggestive identification procedures used; in Count III a § 1983 claim arising from fabrication of evidence by Hobbs in conspiracy with the other individual officer Defendants; in Count IV a state law claim for malicious prosecution; and in Count V a state law claim for the infliction of emotional distress.  He sues the Board members in their official capacities, see id. ¶ 10, and names in the caption the individual officer Defendants in their individual and official capacities, see id. at 2.

The Criminal Case and Subsequent Proceedings.  Late in the evening of June 4, 1984,

Ball was fatally shot at the Amoco Service Station near the corner of Delmar and Goodfellow

in the City of St. Louis.[5]  (Defs. Stat.-2[6] ¶ 34, ECF No. 171-1.[7])  Gunter was the first police

officer to arrive at the scene.  (Id. ¶ 36.)  Cummings, a homicide detective, was a member

of the service crew[8] that responded to the scene.  (Id. ¶¶ 43, 46, 47.)  The other two crew

members present that night were Joe Beffa and George Seper.  (Id. ¶ 48.)  Hobbs was not at

the murder scene.  (Id. ¶ 68.)  His involvement began one or two days later[9] and included

interviewing Walker.  (Defs. Reply-2 Ex. R at 154, ECF No. 187-12.)   After Walker

identified Plaintiff as the shooter, a wanted was placed for Plaintiff.  (Defs. Stat.-2 ¶ 78.)

On June 7, Hobbs interviewed Simmons over the telephone; Simmons said he had not seen

the shooter.  (Id. ¶ 81.)  Four days later, Hobbs spoke with Simmons again.  (Defs. Mem.-2

Ex. D-2 at 8, ECF No. 171-6.)   Simmons was shown a photograph array and selected

---

[5]Although the parties alleged many facts in their respective briefs, the Court cites only those facts relevant to its decision.

[6]For ease of reference, the Court will refer to the Statement of Uncontroverted Material Facts submitted by Defendants in support of the second motion for summary judgment as "Stat.-2," to the supporting memorandum as "Mem.-2," and to the reply memorandum as "Reply-2."

[7]A party's Statement of Uncontroverted Material Facts is cited only when it is admitted by the opposing party.

[8]"The service crew was the initial homicide division crew that was called to a homicide." (Defs. Stat.-2 ¶ 46.)

[9]There is a dispute about when Hobbs' involvement began.  Plaintiff contends that it was the day after the murder, citing the affidavit of an investigator who interviewed Hobbs twenty years after the murder.  In Hobbs' cited deposition testimony he states that it was one to two days after Ball was murdered.  Hobbs testified at the criminal trial that his involvement began two days after the murder. The Court disagrees with Plaintiff that this difference in the timing of Hobbs' involvement is significant.

- 4 -

Plaintiff's photograph as being that of the shooter.  (Defs. Mem.-2 Ex. D-3 at 1, ECF No. 171-7.)

Plaintiff was arrested on June 28.  (Defs. Stat.-2 ¶ 89.)  Simmons and Walker subsequently picked Plaintiff out in separate live line-ups as the shooter.  (Defs. Mem.-2 Ex. D-3 at 8-11, ECF No. 171-7.)

Plaintiff was indicted by the grand jury in September 1984 on one count of first degree murder for the fatal shooting of Ball and one count of armed criminal action.  (Defs. Mem-2. Ex. E, ECF No. 171-10.)  His trial began March 25, 1985.  (Pl. Resp. Ex. LL, ECF No. 180-38.)  The State presented six witnesses that day, including Gunter and Walker.  (Id.)  The next day, the State presented seven witnesses, including Williams, Carolyn Lindsey, Stacy Lindsey, Simmons, and Hobbs.  (Pl. Resp. Ex. KK at 2, ECF No. 180-37.)  Williams was the second witness; Hobbs was the seventh.  (Id.)  No physical evidence was introduced.[10]  See **Burton**, 295 F.3d at 842.

Plaintiff called two witnesses, including himself.  (Pl. Resp. Ex. KK at 3.)  The case went to and was returned by the jury the following day.  (Id.)  Plaintiff was convicted of both counts and sentenced the following month to fifty years imprisonment without probation or parole on the murder charge and a consecutive twenty-five year term on the armed criminal action charge.  See **State v. Burton**, 710 S.W.2d 306, 307 (Mo. Ct. App. 1986).

---

[10]The state habeas court found that the prosecution had presented no evidence of motive.  See Burton v. Dormire, 06AC-CC00312 at 13 (Mo. Cir. Ct. Aug. 18, 2008) (Pl. Resp. Ex. B, ECF No. 180-2.)  The Eighth Circuit noted that the prosecution had introduced testimony from a cousin of Ball about a feud between him and Plaintiff.  **Burton**, 295 F.3d at 843.  The court further noted that her testimony was undermined by other testimony and her misidentification of Ball's murderer.

Plaintiff appealed on the grounds that the evidence was insufficient to convict him; the prosecuting attorney committed plain error by eliciting testimony from two police officers who referred to his silence after he had been given *Miranda*[11] warnings; and the trial court had erred by allowing the prosecuting attorney to personalize his attack against defense counsel.   In his first ground, he specifically argued that the testimony of the two eyewitnesses, Walker and Simmons, was "'self-serving'" and "'perjured.'"  **Id.** at 308.  Relief was denied on all grounds.  **Id.** at 308-09.

Plaintiff then filed for post-conviction relief.  See **Burton v. State**, 817 S.W.2d 928 (Mo. Ct. App. 1991).   After an evidentiary hearing at which his trial counsel and the prosecuting attorney testified, relief was denied.  (Id. at 929; Defs. Reply-2 Ex. Y, ECF No. 187-22.)  The denial was affirmed on appeal.  **Burton**, 817 S.W.2d at 930.

Plaintiff next sought relief under 28 U.S.C. § 2254.  The Eighth Circuit Court of Appeals affirmed the denial of relief by the district court.  See **Burton v. Dormire**, 295 F.3d 839 (8th Cir. 2002).  Noting that "[t]he writ of habeas corpus balances the constitutional imperative of a fair criminal trial with respect for state court judgments and the finality thereby achieved for victims of crime and society at large[,]" the court opined that

> [t]he present case suggests we may not have achieved the optimal balance.
> Darryl Burton's habeas petition depicts a troubling scenario.  One cannot read
> the record in this case without developing a nagging suspicion that the wrong
> man may have been convicted . . . .  Burton was convicted on the strength of
> two eyewitness accounts.  Since his trial and imprisonment, new evidence has
> come to light that shakes the limbs of the prosecution's case.  One eyewitness
> has recanted and admitted perjury.  The other eyewitness's veracity has been
> questioned by a compatriot who avers it was physically impossible for him to

---

[11]Miranda v. Arizona, 384 U.S. 436 (1966).

have seen the crime. . . .  Unfortunately, Burton's claims and evidence run headlong into the thicket of impediments erected by courts and by Congress. Burton's legal claims permit him no relief, even as the facts suggest he may well be innocent.  Mindful of our obligation to apply the law, but with no small degree of reluctance, we deny Burton a writ.

**Id.** at 842.

Subsequently, Plaintiff filed a state petition for a writ of habeas corpus.  See Mo.S.Ct.R. 91.  He raised three grounds for relief:  (1) new evidence established that he was innocent of Ball's murder, consequently he was "entitled to relief based on an 'independent' or freestanding claim of actual innocence"; (2) his trial counsel was ineffective for failing to investigate and present evidence to disprove the State's case; and (3) the State failed to disclose exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83 (1963).  (Pl. Resp. Ex. B at 3, ECF No. 180-2.)  Over the course of a two-day evidentiary hearing in April 2007, the court heard testimony from twenty-three witnesses.  (Id. at 6.)  The videotaped testimony of three additional witnesses was submitted.  (Id.)  Addressing the reliability of the testimony given by Simmons and Walker, the court found as follows.

Witnesses located by the police after the shooting were not able to identify the assailant.  Claudex Simmons, who was in the vicinity, initially told police he did *not* see the shooter.  Later, though, after being charged with attempted second-degree robbery in an unrelated case, Simmons decided he *had* seen the something and could identify the shooter.  Simmons testified at his deposition:  "I had caught a case.  I asked to talk to one of them [the police]."

During the police investigation, Simmons identified [Plaintiff] from a photograph and also picked him out in a live line-up.  Cross examination during trial showed, however, that his story shifted in important respects.  For instance, Simmons initially told police that he had been exiting the liquor store next to the gas station when he heard the shots and saw the shooter chasing the victim.  At trial, however, Simmons stated that he was at the liquor store *before the shooting* and that he was standing in line to buy cigarettes at the

- 7 -

station when he heard shots and observed the shooting.  Simmons denied his earlier statement that he had been exiting the liquor store when he heard the shots.

Although he was well acquainted with [Plaintiff], Simmons falsely told police that he did *not* know him, and Simmons stuck with that statement even after identifying [Plaintiff] from a photograph.  At trial, Simmons shifted, acknowledging that he knew [Plaintiff].   When interviewed by police, Simmons had described the shooter as having his hair in"corn rows."  At trial, however, he denied that he had mentioned "corn rows" in his description and stated that he had told officers that the shooter wore his hair in "curls."

Simmons testified that, after the shooting, the assailant ran in a northerly direction off the lot and turned right on Goodfellow.  Notably, Simmons' testimony on this point contradicted that of the other "eyewitness," Eddie Walker, who gave an entirely different description of the shooter's escape.

During trial, Simmons testified that he had only two convictions – both for stealing over $150 – and that he was awaiting sentencing in a case where he had just pled guilty to attempted second degree robbery.  Simmons gave a confused description of his plea deal.  On direct examination, he stated that under the terms of his plea deal, he would receive a three year sentence if he did not testify against [Plaintiff] and would receive a one year sentence if he did testify.  Then, on cross-examination, he stated he was *already* on probation as part of a deal to testify at [Plaintiff's] trial.  Then, on redirect he changed his testimony again, stating that he was not on probation and that he had pled guilty to an attempted robbery charge carrying a penalty of one to three years.  If he testified truthfully, he would get one year, and if he did not, he would get three years.

. . .

According to testimony at trial, officers patrolling the neighborhood a few days after the shooting ran into one "Tampa Red," a street informant.  "Tampa Red," who was not identified by his real name in the police report, introduced police to one Eddie Walker, who claimed to have seen the shooting.  According to the police report, Walker was standing on the Amoco lot next to the liquor store when he saw the victim drive onto the lot and start to put gas in his car.  Walker allegedly saw the shooter walk from the south side of Delmar, approach the victim, and start shooting.  Walker told police that the assailant chased the victim while shooting continuously, then "ran back south across Delmar" and entered a 1976 blue Buick.  At trial Walker

- 8 -

testified that he saw the shooter, but stated that he never saw a gun in the shooter's hand.

The police report does not contain a description of the assailant from Walker, but states that Walker identified [Plaintiff] from a photograph and then identified him in a line-up.

During subsequent statements and testimony, however, Walker's account shifted dramatically.  In addition, Walker ultimately gave three different versions of how the shooter supposedly left the lot.

Although Walker told police two days after the murder that he had known [Plaintiff] for "ten years," Walker testified at his deposition that he did not know [Plaintiff] at all, but only knew *of* him, and had known *of him* for only *one year*.  At trial, Walker reversed course again, stating that he had known [Plaintiff] *by sight* for about ten years and denying that he had made any statement to police about knowing [Plaintiff] for ten years.  According to these contradictions, Walker told police he had known Ball for "at least ten years."  But, in his deposition and trial testimony, he stated that he had never met Ball and had never even seen him before the night of the shooting.

Walker also told police he saw [Plaintiff] approach the Amoco station from the south and also saw the victim drive up and begin to put gas in his car. At trial, however, he flatly denied making these statements to police, claiming instead that he *never saw Ball in his car*, and, in fact, never saw Ball's car at all.  He also denied telling police that he saw the shooter walk on the lot from the south side of Delmar.  When asked about his statements to the detective, he repeatedly said, "No, I did not tell him that" and "I don't remember saying that."

At trial, Walker testified that his attention was drawn to the lot when he heard the first shot and turned around, away from the liquor store where he was drinking from a "half pint" of gin or vodka, and conversing with acquaintances.  Although Walker stated there was some lighting on the lot, he was unable to recall key aspects of the shooter's features.  When asked about the shooter's appearance at trial, Walker could not recall whether the man had a beard or mustache, or the hairstyle or clothing he wore.  At trial, he claimed that the shooter wore his hair in "corn rows," then claimed the shooter wore his hair in a "curl."  Then, when asked if the shooter wore a "short Afro," he stated:  "I don't remember."  At his pretrial deposition, Walker had been similarly vague and unable to provide any description of the assailant.  When asked specific questions about the shooter's appearance at his deposition,

Walker had stated:  "I'm trying to think.  I can't say.  You know, I'm getting confused and stuff now.  I don't know."

Walker also gave three entirely different, mutually exclusive accounts of how the shooter left the Amoco station.  In his initial statement to police, Walker stated that he saw the suspect run south across Delmar "in the vicinity of the McDonald's restaurant" (which is located to the east) and enter a 1976 blue Buick.  In his second statement to police, given when he viewed the line up, Walker changed his story, stating that the shooter ran in a "southwesterly" direction and that he did not see where the shooter ended up.  At his deposition, Walker stuck with his story that the shooter ran in a southwesterly direction down Delmar.  But, he denied that he saw [Plaintiff] entering a vehicle, as he had originally told police.  At trial, Walker combined aspects of his two previous versions, stating that the shooter ran toward him (to the east), then "turned around to his right" and "circled" and "ran across the street" and ended up "on the lot of the car wash."  At trial, Walker repeatedly denied that he ever told police that the shooter ran across Delmar in the vicinity of McDonald's and that the shooter entered a 1976 Buick.

Each of Walker's three accounts conflicted with the account of Simmons, who testified that the assailant ran off the lot in a northerly direction and turned right on Goodfellow.

(Id. at 7-12; first alteration in original.)

The court noted the affidavit signed by Simmons five months after Plaintiff's trial averring that he had perjured himself at the trial and had not seen Plaintiff murder Ball.  (Id. at 14.)  The court also noted that, at the time of trial, Simmons had "six of seven prior felony convictions and at least five misdemeanor convictions"; he had acknowledged two convictions at time.  (Id. at 17.)  Indeed, an information filed against him in November 1984 in St. Louis City charged Simmons as a prior and persistent offender with four felony convictions.  (Id. at 31, 32.)  And, at the time of trial, he had two cases pending against him, one of which was being prosecuted by the St. Louis City prosecutor's office and one by the St. Louis County prosecutor's office; he had acknowledged only one pending case.  (Id. at

- 10 -

17, 32.)  The court found that, given the "gross inconsistencies" in Walker's account, Simmons was the State's primary witness; consequently, had the jury known of his entire criminal record, they would have accorded his testimony little or no weight.  (Id. at 40.) After determining that Plaintiff had made a sufficient showing of innocence to satisfy the criteria of Clay v. Dormire, 37 S.W.3d 214 (Mo. 2000) (en banc),[12] for review of a defaulted claim, the court concluded that the failure to disclose Simmons' background rendered Plaintiff's trial "fundamentally unfair" and entitled him to a new trial.  (Id. at 42.)  The court ordered Plaintiff released unless the St. Louis Circuit Attorney requested that he be returned for retrial.  (Pl. Resp. Ex. B.)  He was released.  This action followed.

In support of his claims against Defendants for violating his constitutional rights, Plaintiff cites seven instances when "critical exculpatory information" was allegedly withheld from the prosecutor:  (1) "Defendants fed Claudex Simmons information about who to pick and coerced him into falsely identifying Plaintiff as the shooter, though Simmons had not seen the shooter"; (2) "Hobbs concealed the fact that he expressed interest in Plaintiff as a suspect before Walker gave any 'identification'"; (3) "Hobbs falsified the manner in which Eddie Walker became a witness in the case"; (4) "Hobbs removed exculpatory information from the 'working copy' of the police report before he disclosed the report to the prosecutor"; (5) "Joan Williams told . . . Cummings that the shooter was light-skinned, a statement that

---

[12]The Missouri Supreme Court held in Clay that a habeas corpus petitioner's procedurally defaulted claim may be reached on its merits if there is a showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent[.]"  Clay, 37 S.W.3d at 217 (internal quotations omitted).  And, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light [of new evidence of innocence]."  Id. (alteration in original).

would necessarily have excluded Plaintiff"; (6) "Williams looked at photographs on the eve of trial and told . . . Hobbs that the defendant was "the wrong man"; and (7) "[e]yewitness Sam Coleman told . . . Wilder on the night of the shooting, and . . . Cummings the following day, that the shooter was not Plaintiff, a man Coleman knew." (Pl. Resp. at 37, ECF No. 179.)

    Simmons' Identification.   Gunter was the first police officer to arrive at the murder scene. (Defs. Stat.-2 ¶ 36.)   On his arrival, he saw three people standing over Ball: Simmons, Anthony Brown, and Marshall Thomas. (Id.) They informed Gunter that they had heard three guns shots and then seen Ball lying on the ground. (Id.) Gunter wrote the initial, two-page police report. (Defs. Stat.-1 ¶ 22[13], ECF No. 169-1.) It was Gunter's practice "to give the homicide detectives as much information as he had." (Id. ¶ 20.) Brown and Thomas, later separately interviewed by homicide detectives, related that they did not know Ball and did not see the shooter. (Defs. Stat.-2 ¶ 37, ECF No. 171-1.) Simmons, interviewed over the telephone by Hobbs on June 7, made a similar statement. (Id. ¶ 81-82; Defs. Mem.-2 Ex. A at 381, 386, ECF No. 171-2.)

    Following the initial police response, a service crew went to the murder scene. (Defs. Stat.-2 ¶¶ 39, 48.)   A service crew is "the initial homicide division crew" to respond to a homicide. (Id. ¶ 46.)   Cummings, a member of the service crew that responded to the Ball murder scene, interviewed anyone at the scene, including Joan Williams, who was then

---

[13]Paragraphs one through thirty-three of Defendants' Statement of Uncontroverted Material Facts were submitted in support of Gunter's and Wilder's motion for summary judgment.

working as a cashier at the station, and Carolyn and Stacy Lindsey, a mother and daughter who were getting gas at the time the shooting occurred. (Id. ¶¶ 47-48, 50, 54.)

Hobbs interviewed Simmons again on June 11. (Defs. Mem.-2 Ex. A at 386.) Nichols was present during this interview. (Defs. Mem.2 Ex. D at 8, ECF No. 171-6.) Hobbs testified at trial that this second interview resulted from another homicide detective, Anthony Rice, informing him that Simmons wanted to talk about Ball's murder. (Defs. Mem.-2 Ex. A at 382, 406.) Simmons told Hobbs that he heard gun shots, saw Ball fall, and also saw a person standing over Ball holding a handgun in his right hand and then putting the gun in his shirt pocket. He told Hobbs he thought he could identify the shooter from a photograph. (Id. at 387.) Consequently, Hobbs assembled a group of four photographs and asked Simmons to sign his name on the back of the appropriate photograph if he recognized anyone from being at the murder scene. (Id. at 386-87, 390.) Asked in his deposition to describe the process of assembling a photograph array, Hobbs explained that if he had a person of interest, he would try to gather photographs that resembled that person as closely as possible and be as fair as possible. (Defs. Reply-2 Ex. R-2 at 113-14, ECF No. 187-12.) He would get these "filler" photographs from the record room after giving a physical description of the person of interest. (Id. at 114-15.) The descriptors would include height, weight, complexion, race, and any prominent features. (Id. at 116.) Simmons signed his name on the back of a photograph, that of Plaintiff. (Def. Reply-2 Ex. K at 339-40, ECF No. 187-3.) Simmons explained to Hobbs that he had initially told him that he did not see anything because he was afraid and did not want to get involved. (Defs. Mem.-2 Ex. A at 393.) Hobbs had had no contact with Simmons before his June 7 telephone interview and

conducted no further interviews of him after showing him the photograph array.  (Defs. Stat.-2 ¶ 88; Defs. Mem.-2 Ex. A at 390.)

On June 28, Simmons, with his attorney present, viewed a live line-up of five people and identified Plaintiff as the shooter.  (Defs. Stat.-2 ¶ 101.)  Riley was in charge of the line-up.  (Defs. Mem.-2 Ex. D-3 at 9-10; Defs. Stat.-1 ¶¶ 31, 32; Defs. Stat.-2 ¶¶ 92, 95.)  Hobbs was present; Nichols, Cummings, Gunter, and Wilder were not.[14]  (Id.)  After the line-up, Simmons and his attorney went to the warrant office.  (Defs. Stat.-2 ¶ 103.)  His attorney instructed Simmons not to speak with any officer, and he followed her advice.  (Id. ¶ 105; Defs. Mem.-2 Ex. A at 494.)

As noted above, Simmons made a deal with the prosecutor in exchange for his testimony at Plaintiff's trial.  Hobbs' testimony that he did not know about the deal until the beginning of the criminal trial is unrefuted.  (Defs. Mem.-2 Ex. A at 394.)

Five months after testifying under oath at Plaintiff's trial, Simmons signed an affidavit averring that he did not witness Plaintiff shoot Ball.  (Pl. Resp. Ex. G ¶ 9, ECF No. 180-7.)  He further averred that he gave perjured testimony in exchange for immunity.  (Id. ¶¶ 4-5, 7.)  Plaintiff's defense counsel testified, under oath, at the state habeas evidentiary hearing that she interviewed Simmons when preparing Plaintiff's direct criminal appeal.  (Defs. Reply-2 Ex. O at 186-87, ECF No. 187-7.)  He informed her that he had signed the post-trial affidavit when threatened with physical harm and, if called to testify that he had given perjured testimony at Plaintiff's criminal trial, he would say he had not but had been

_____

[14]Indeed, there is no evidence of any contact between Simmons and Cummings, Gunter, or Wilder.

threatened to complete the affidavit.  (<u>Id.</u> at 186-87.)  When called to testify at the same hearing, Simmons stated that he had lied when testifying at Plaintiff's trial and had been coerced.  (Defs. Reply-2 Ex. AA at 33, ECF No. 187-33.)  He first testified that he had been "coerced by the prosecuting attorney and the arresting officer."  (<u>Id.</u>)  Asked how, he explained he was coerced by them "telling [him] what to say."  (<u>Id.</u>)  Asked "[w]ho told [him] what to say," he replied, "The prosecuting attorney."  (<u>Id.</u>)  He thought the prosecutor's name sounded like "Kowosky."  (<u>Id.</u>)  The prosecutor was Anthony Gonzalez.  Simmons did not identify the arresting officer, nor is there any evidence that he was present when Plaintiff was arrested or even knew who had arrested Plaintiff.

<u>Hobbs' Interest in Plaintiff as a Suspect.</u>  Plaintiff contends that Hobbs "did not like him," thought that he and his friends "would cause trouble in the neighborhood," and thought of him as a "'sh*t ball.'"  (Pl. Stat. ¶ 30, ECF No. 180.)  This personal animosity is described to support Plaintiff's argument that Hobbs irrationally focused on him as a suspect, thereby foregoing any investigation of another suspect, Jesse Watson.

Jim McCloskey[15] averred in an October 2011 affidavit that he interviewed Hobbs in February 2001.  (Pl. Resp. Ex. Q ¶ 3, ECF No. 180-17.)  Hobbs "likened [Plaintiff] to 'a police character.'"  (<u>Id.</u> ¶ 4.)  Hobbs described Plaintiff "as a 'real sh*it-ball.'"  (<u>Id.</u>)  In his February 2012 deposition, McCloskey reported that Hobbs "had a very low opinion" of Plaintiff . . . ."  (Pl. Resp. Ex. P at 136; ECF No. 180-16.)  Hobbs called Plaintiff "a police

---

[15]McCloskey describes himself as the founder and executive director of Centurion Ministries. (<u>Id.</u> ¶ 2.)  Centurion Ministries is described on its website as an organization whose "mission is to free from prison those innocent individuals who had absolutely nothing whatsoever to do with the crimes for which they were convicted and sentenced to either life or death."  <u>Centurion Ministries,</u> <u>http://www.centurionministries.org</u> (last visited May 16, 2011).

character and something to the effect that he was a dirt ball, something, something like that, and he characterized [Plaintiff] as being not a leader, but a follower, and somebody who would rob winos."  (Id.)

Hobbs testified in his May 2011 deposition that he rode the beat that Plaintiff grew up in and had been transferred from that beat in approximately 1976. (Defs. Reply-2 Ex. R-2 at 126, ECF No. 187-12.)  Plaintiff was then a kid.  (Id. at 128.)  Hobbs did not think Plaintiff "spent a whole lot of time in school."  (Id.)  When Hobbs first met Plaintiff, he was an "in between" kid, neither good nor bad.  (Id.)  Plaintiff then "turned" "kind of bad."  (Id.)  He was neither a member of the "National Honor Society or something like that" or " a hardened, terrible, terrible person."  (Id. at 128-29.)  He was one of a group of kids who "used to like roll winos and stuff like that."  (Id. at 129.)  Plaintiff came to his and other officers' attention more than once.  (Id.)  He was not, however, "on any big radar screen" with Hobbs.  (Id. at 130.)  Hobbs had had no interaction that he could recall with Plaintiff after he was transferred and before the Ball murder investigation.  (Id.)  He could not recall ever taking Plaintiff into custody until the Ball case.  (Id. at 134-35.)  Nor could he remember every suspecting Plaintiff of anything other than "petty stuff, taking money from winos."[16] (Id. at 136.)

Plaintiff also takes issue with the seemingly erratic use in the police report of the term "wanted suspect."

---

[16]This description is given by the attorney for Plaintiff questioning Hobbs.

The word "subject" is used in the first description of the shooter, one given by Carolyn Lindsey when interviewed at the scene by Cummings. (Pl. Resp. Ex. D-1 at 10, ECF No. 171-5.) In the remainder of her description, the term "wanted subject" is used. (Id.) Similarly, in the description of the interview with Stacy Lindsey, "subject" is first used – once – followed by "wanted subject." (Id.) In the report of Williams' interview, the term "wanted subject" is the only one used to describe the shooter. (Pl. Resp. Ex. D-1 at 1, ECF No. 171-6.) Another witness, Barbara Koller, was interviewed by a detective Frank Banaszek and reported seeing four to five African-American males running and getting into a car after shots were fired. (Id.) They are described as "subjects." (Id. at 2.) Ball's cousin described problems Ball had had with Watson and "the wanted subject." (Id.) "Wanted subject" is again used in the summary of a re-interview of Carolyn Lindsey and in the report of an interview with Ball's aunt and her minor daughter; the aunt also identified Watson as someone with whom Ball had had trouble. (Id. at 3-4.) In the report of interviews with Walker, Simmons, and other potential witnesses, "wanted subject" is used to describe the shooter. (Id. at 6-8; Defs. Mem.-2 Ex. D-3 at 1, ECF No. 171-7.)

A "Personal Descriptors Continuation Form" dated June 11, 1984, and signed by Hobbs and a reviewing officer names Plaintiff as "subject no. 1." (Pl. Resp. Ex. D-1 at 7.)

The police report was again supplemented on June 29, 1984.[17] (Id. at 3-11.) In a section titled "Additional Details," it is reported that two witnesses had made a positive identification of the shooter; the term "arrested subject" is used. (Id.)

_____

[17]Any report generated following the original report prepared by the uniform district patrolman who responded to the crime scene is referred to as a supplemental report. (See Defs. Reply-2 Ex. Q-1 at 24, ECF No. 187-9; Defs. Reply-2 Ex. R-1 at 50, ECF No. 187-11.)

When asked about the report in a deposition, Cummings testified that the only changes he could think of were the substitutions of the term "wanted subject" for Plaintiff's name after he became wanted.  (Defs. Mem.-2 Ex. C at 136, ECF No. 171-4.)  Cummings would not use the term "wanted subject" unless a wanted had been placed for the person. (Def. Reply-2 Ex. Q at 16; Pl. Resp. Ex. GG at 21-22, ECF No. 180-33.)  When he had written his portion of the report, he had no idea of who might be arrested for Ball's murder; consequently, he would not have used the term "wanted subject" to refer to Plaintiff.  (Defs. Mem.-2 Ex. C at 114; Pl. Resp. Ex. GG at 115.)  It was a requirement that an arrested or wanted subject not be identified by name.  (Defs. Reply-2 Ex. Q-1 at 13.)  Consequently, what Cummings wrote would be edited after Plaintiff was arrested to refer to him as the "wanted subject."  (Id. at 117-18, 135; Pl. Resp. Ex. GG at 116.)  When asked in his deposition if he understood why the term "wanted subject" was in Williams' description of the shooter but not in the Lindseys' descriptions, Cummings replied that he did not.  (Pl. Resp. Ex. GG at 133; Defs. Reply-2 Ex. Q at 125-26.)

When asked at his deposition why Plaintiff was referred to as "wanted subject" in the description of the interview with Ball's cousin when he had yet to be so identified and when Watson was identified by his proper name, Hobbs replied that he thought the reference was required by a Missouri statute prohibiting the use of a person's name after that person became a suspect.  (Defs. Reply-2 Ex. R-2 at 213, 215, ECF No. 187-12.)

Veronica Richters testified in her deposition that she had been a typist in the SLPD homicide division at the relevant time.  (Pl. Resp. Ex. QQ at 6; ECF No. 180-43.)  When

typing a final report, she would not have made any word changes, including changing a term to "wanted suspect."  (Id. at 34-35, 49.)

Eddie Walker.  Riley was Hobbs' partner at the time of Ball's murder.  (Defs. Reply-2 Ex. R at 37.)  Riley contacted him a day or two after Ball's murder and asked Hobbs to meet him at a corner near the Amoco lot.  (Id. at 155, 252-53.)  Riley had been flagged down by one of his informants, Tampa Red, and was told that Walker had apparently witnessed the shooting and knew Plaintiff.  (Id. at 234, 237.)  Hobbs showed Walker some photographs; Walker identified Plaintiff as the shooter.  (Id. at 155, 249, 251-52.)  Hobbs initialed the photographs; Walker signed the one that he had identified; and the set was placed in an evidence file folder.[18]  (Id. at 155-56, 257-58.)  When typing his notes on Walker's interview, Hobbs would have used the term "wanted subject" to refer to Plaintiff because a wanted had been put out for him after Walker's identification.  (Id. at 237-38, 249.)  He considered Walker's identification of Plaintiff to be probable cause for Plaintiff's arrest.[19]  (Id. at 239.)

Cummings testified that when compiling a photograph array he would include at least four photographs and up to seven or eight photographs.  (Defs. Reply-2 Ex. Q at 168.) Hobbs also tried to have at least four photographs to show a potential witness.  (Pl. Resp. Ex. L at 125.)

After Plaintiff was arrested, Walker identified him in a live line-up.  (Defs. Stat.-2 ¶ 92; Defs. Mem.-2 Ex. A at 173, ECF No. 171-2.)  Riley was in charge of the line-up.

_____

[18]Consequently, the photographs later shown Simmons were a different set.  (Defs. Reply-2 Ex. R at 124.)

[19]Counsel for Plaintiff stated that no one was "debating your probable cause."  (Defs. Reply Ex. R at 40.)

(Defs. Mem.-2 Ex. D-3 at 10-11.)  Nichols was present; Hobbs, Cummings, Gunter, and Wilder were not.  (Defs. Mem.-2 Ex. D-3 at 9, 11; Defs. Stat.-1 ¶¶ 31, 32; Defs. Stat.-2 ¶¶ 92, 95.)

McCloskey related in his 2011 affidavit a description Hobbs gave him in 2001 of how he first encountered Walker.  (Pl. Resp. Ex. Q.)  Hobbs saw "three or four winos" on a front porch and asked if they knew "Delmar" – Plaintiff's nickname.  (Id. ¶ 5.)  He and his partner gave the men their cards.  (Id. ¶ 6.)  One, Walker, later came forward and said he knew who the shooter was.  (Id.)  When McCloskey showed Hobbs the police report about Riley discovering Walker, Hobbs stated, "'Maybe he did, but I remember the flophouse.'"  (Id. ¶ 7.)  McCloskey testified to a similar effect in his later deposition.  (See Pl. Resp. Ex. P at 137.)

Removal of Information from Police Report.  As noted above, Cummings interviewed Williams and Carolyn and Stacy Lindsey at the scene.  His report of Carolyn's statement reads as follows.

> [Carolyn] stated she was inside her vehicle at the gas pumps next to the cashier's booth on the east side of the lot.  She heard three to four shots and looked up.  She observed the victim running from his green car . . . .  She further observed a subject, described as: Negro male, 20-21 years of age, short afro, wearing a yellow T-shirt, khaki pants, 5'5" to 5'6" tall, chasing the victim north around the cashier's booth, shooting at him as he was chasing him.  She did not notice where the wanted subject had come from initially.  She did not know where the wanted subject had fled after the shooting, as she was trying to get her daughter, Stacy, inside the car.  Stacy was pumping gas into their vehicle when the shooting began.  She stated that she did not recognize the wanted subject and did not get a very good look at him.  She thought that the gun he had was a small one.

(Defs. Mem.-2 Ex. D-1 at 10.)  Cummings' report of Stacy's statement reads as follows.

[Stacy] stated she was pumping gas into their vehicle, with her mother sitting inside the car.  She heard three to four shots and turned around and observed the victim being chased around and behind the cashier's booth by a subject described as:

> Negro, male, 20-21 years of age, short afro, 5'5" to 5'6", thin build, medium skin, yellow T-shirt, khaki pants.

The wanted subject chased the victim from a green car . . . , shooting at the victim as he chased him.  She did not know in what direction the wanted subject ran after the shooting, as she was trying to get behind her car and away from the gunshots. . . .  She did not notice where the wanted subject had approached from.  She did not know the wanted subject and did not get a very good look at him. . . .

(Id.)  And, his report of Williams' statement reads, in relevant part:

> Williams then heard three or four shots and observed the victim being chased by the following described wanted subject:
> > Negro, male, 20-21 years of age, 5'5" to 5'5", thin build, short afro, yellow T-shirt, khaki pants.
> The wanted subject was shooting at the victim as he was chasing him.  The victim ran around behind the cashier's booth, with the wanted subject still chasing him.  She could not see in what direction the wanted subject ran after the shooting.  She did not recognize the wanted subject, as she did not get a good look at him.

(Defs. Mem.-2 Ex. D-2 at 1.)

Carolyn Lindsey was again interviewed the day after Ball was killed.[20]  (Id. at 2, 3.) After viewing several photographs, including one of Plaintiff, she stated that she did not get a good look at the shooter as she and Stacy were getting down and trying to keep from being shot themselves.  (Id. at 3.)  She further stated that Stacy would also not be able to identify "the wanted subject."  (Id.)

When Cummings interviewed someone, he would try to find out what the person saw and then write down what the person related.  (Defs. Mem.-2 Ex. C at 103.)  He did not try

---

[20]Two of the three detectives who interviewed her are not named as a defendant; the third, Rousin, see note 2, supra, has been dismissed without prejudice.

to find out what the person did *not* see or question how the person could have seen what he or she described.  (Id.)  If Carolyn Lindsey had given him a description of the shooter's complexion, he would have written it down.  (Id. at 114; Pl. Resp. Ex. GG at 110.)  However, she might not have offered such a description, he might not have asked, or she might have said she could not tell the shooter's complexion. (Defs. Mem.-2 Ex. C at 114.)  Cummings would have interviewed Carolyn and Stacy separately.  (Defs. Reply-2 Ex. at 127.)  The description of the shooter being of medium complexion in Stacy's portion were "probably her words."  (Id. at 129.)

In his deposition taken twenty-seven years after Balls's murder, Cummings could not think of any reason why he would have written in the report that Carolyn did not get a "very good look" at the shooter and Williams did not get "a good look" unless that was what the witnesses told him.  (Id. at 138-39.)

The original police report is prepared by the responding officer, in Ball's case, Gunter. (Defs. Reply-2 Ex. R at 179, 203.)  Gunter would have prepared the report at the homicide office and would probably have given his notes to the service crew.  (Id. at 203-04.)  Any additional reports, including those of interviews and of laboratory findings, are supplemental reports.  (Defs. Reply-2 Ex. Q at 24.)  Homicide reports are always supplemental reports. (Defs. Reply-2 Ex. R at 50.)  Cummings types his reports from notes.  (Defs. Reply-2 Ex. Q at 30, 32.)  When taking notes, he includes any information that is relevant, and uses most of his notes when typing the report.  (Id. at 32.)  He keeps his notebooks until they are full – for approximately six months.  (Id. at 30.)  He and other service crew members do not leave the office until a working copy of the police report is prepared and a file is opened.

- 22 -

(Id. at 66, 70, 73, 148.)  In the Ball case, Riley received the working copy of the report prepared by the service crew.  (Defs. Reply-2 Ex. R at 80.)

If another detective interviewed someone, that detective would prepare a memorandum of the interview that would then be pasted into a supplemental report.  (Pl. Resp. Ex L at 78.)  The cut and pasted report would be typed by a stenographer in a final form.  (Id. at 77-78.)  Hobbs would get the cut and pasted report back from the stenographer with the typed report so he could compare the two versions.  (Defs. Reply-2 Ex. R at 87-88.) His usual practice was to destroy his notes as soon as the information was included in the report.  (Id. at 202.)  The finished report would be placed in the homicide file when the case was closed, i.e., when an arrest was made; the working copy would be destroyed by the section supervisor.  (Id. at 89-90, 98.)  Any evidence would have been picked up by the prosecutors before then.  (Id. at 91.)

Hobbs testified in his deposition that he understood in the 1980s that any pertinent information, i.e., anything learned in his investigation of a case, was to be included in the report which was turned over to the prosecutors.  (Defs. Mem.-2 Ex. B at 46, 48.)  Whatever information was learned during an investigation was turned over to the prosecutors.  (Defs. Reply-2 Ex. R at 47.)  Similarly, Wilder testified that he had been trained to include all pertinent information in his report, including facts about witnesses, e.g., whether a witness made a statement.  (Defs. Reply-2 Ex. S at 79, ECF No. 187-15.)  Cummings testified that anything relating to the case "would have been shared and written down."  (Defs. Reply-2 Ex. Q at 146, ECF No. 187-9.)  Gunter would have given the homicide detective as much information as he had.  (Defs. Mem. Ex. G at 46-47, ECF No. 169-8.)

After Hobbs completed his report, it was given to his sergeant.  (Defs. Reply-2 Ex. R  at 68.)  If there were no corrections to be made, the sergeant would forward it to the deputy commander and commander of the unit.  (Id. at 68-69.)  The report, including all supplemental reports, was given to the prosecutors when a warrant application was made. (Id. at 55.)  At that time, the police investigation was complete and the decision was the prosecutors' on how to proceed.  (Id. at 56, 66.)

Hobbs did not recall any specific training on his obligation to turn over information to the prosecutors.  (Defs. Mem.-2 Ex. B at 47.)  Nor did Wilder.  (Defs. Reply-2 Ex. S at 77-78.)  Wilder had never heard of a *Brady* obligation.  (Id. at 77.)  Cummings was never trained on *Brady* obligations.  (Pl. Reply Ex. GG at 50.)

When asked why Williams' and Stacy's descriptions of the shooter were indented in the police report and Carolyn's was not,[21] Cummings could think of no reason.  (Id. at 95-96.) Ideally, the description of the shooter should be indented.  (Id. at 96.)

Joan Williams.  Williams did not talk to police between the time she was first interviewed the night of the shooting and the trial.  (Defs. Reply-2 Ex. M at 136, ECF No. 187-5.)  At trial, she testified that Ball was pumping gas after having prepaid for a set amount when she heard a shot and saw him running.  (Defs. Reply-2 Ex. L at 255, ECF No. 187-4.) She called police.  (Id.)  She could not identify the shooter or report in which direction he had run, but did describe his clothes, i.e., brown khaki pants and a yellow top, and his height, 5'8" to 5'9".  (Id. at 257.)  She did not see the shooter's face.  (Id.)  When asked if that was

---

[21]See pages 21-22, supra.

all she remembered, she replied that it was.  (Id.)  She did not see anyone approach Ball.  (Id. at 260.)  At the time of the shooting, there were three to four cars on the lot; two were near Ball's car.  (Id. at 264.)  When asked on cross-examination about her earlier description of the shooter as being 5'5" to 5'6" in height, she replied that it was "somewhere around there." (Id. at 263.)  She had also described the shooter as having a short Afro.  (Id.)

At the 2007 state habeas evidentiary hearing, Williams described the shooter's clothing as tan khakis, a yellow shirt, and a black cap.  (Defs. Reply-2 Ex. M at 127.)  She saw the front of the shooter's face for a second – he was light-skinned and nice-looking.  (Id. at 131-32, 146, 154.)  After the shooting ended, she saw the shooter run toward Enright.  (Id. at 146.)  He did not have a short Afro, although she had told people he did.  (Id. at 135, 147.) She gave a description of the shooter to the police, but did not remember whether she was asked about his complexion.  (Id. at 135.)  She thought she had told police the night of the shooting that the shooter was light-skinned.  (Id. at 158.)  She had told two men that the shooter was light-skinned when she was shown some photographs at the courthouse ten to fifteen minutes before she was called to testify at Plaintiff's trial.  (Id. at 135-36, 138, 139.) She did not know if the two men were deputies.  (Id. at 137.)  She was not asked at the trial if Plaintiff was the man she saw.  (Id. at 140.)  She had testified truthfully at trial; however, for some reason, she saw things more clearly twenty-three years later.  (Id. at 149-50.)  At the time of trial, she was not much of a talker.  (Id. at 148.)

Hobbs testified in his deposition that he would have been called to go to the courthouse shortly before having to testify.  (Defs. Reply-2 Ex. R at 174.)  He did not spend any time in a witness room, and if he was in one, he was there by himself.  (Id. at 174-75.)

- 25 -

The investigators for the prosecutors would take care of any of the State's witnesses.  (Id. at 173.)  Gonzalez averred that if any of the investigators in the prosecutors' office had learned of any exculpatory or impeaching statements, the information would have been reported to him. (Pl. Resp. Ex. MM ¶ 8, ECF No. 180-39.)  He was never told of an exculpatory statement by Williams.  (Id. ¶ 7.)

When subpoenaed by Plaintiff to testify at a deposition in this case, Williams appeared but declined to answer any substantive questions without a notarized agreement by Plaintiff's counsel that two of her outstanding bills totaling approximately $31,000 would be paid from any monies Plaintiff received.  (Defs. Reply-2 Ex. N at 6, 9, 10, 47, 59, 51, 60, 77-78, ECF No. 187-6.)  She expected the same agreement from Defendants.  (Id. at 64.)  She had not expected any compensation when she gave testimony at Plaintiff's state habeas evidentiary hearing.  (Id. at 81.)

Cummings testified in his deposition that the reference in the police report to Williams not getting a good look at the shooter would have been her words.  (Defs. Mem.-2 Ex. C at 137.)

Sam Coleman.  The day after Ball's murder, Coleman contacted the SLPD in response to a message left at his home.  (Defs. Mem.-2 Ex. D-2 at 5.)  The police report simply indicates that he informed "detectives"[22] that he had gone to the gas station lot to see what

_____

[22]Two detectives, Cummings and Beffa, had gone to his house along with a sergeant and had left a message for him to call after finding him not at home.  Hobbs testified in his deposition that there was no way of knowing from the report who had spoken with Coleman.  (Defs. Reply-2 Ex. R at 229.)  Cummings similarly testified and noted that there was no way of knowing who wrote the summary of Coleman's interview.  (Defs. Reply-2 Ex. Q at 161, 164.)  If Cummings spoke with someone, he usually wrote it down.  (Id. at 161.)

- 26 -

was happening after seeing police cars there.  (Id.)  When at the lot, he spoke with police officer Thomas Wilder.  (Id.)  After telling Wilder how to contact Ball's next of kin, he left the lot and contacted someone himself.  (Id.)  He told the interviewing detectives that he did not know who might have shot Ball.  (Id.)

Coleman testified at the state habeas evidentiary hearing that he had grown up with Plaintiff.  (Pl. Resp. Ex. NN at 80, ECF No. 180-40.)  Coleman was at the gas station when Ball was shot.  (Id. at 81-82.)  He had been there for approximately a minute and was pumping gas into his car when he saw Ball, who he also knew, pull in.  (Id. at 82-83, 86.)  Ball was walking toward his car to pump gas when Coleman was finishing at his car.  (Id. at 89.)  As Coleman was getting into his car, a man walked past him.  (Id. at 89, 91.)  They looked at each other.  (Id. at  91.)  The man was of medium complexion.  (Id. at 95.)  Coleman got into his car and, when he went to start it, heard gunshots, ducked down, and drove off.  (Id. at 91.)  He did not look around, did not look in the rearview mirror as he drove away, did not see a gun, did not see anyone running, and did not see anyone else on the lot.  (Id. at 91, 96, 98-99.)  The man he saw on the lot was not Plaintiff.  (Id. at 102.)  He told an officer, Thomas Wally,[23] this.  (Id.)  Wally asked him that night if the shooter was Plaintiff; he replied it was not.  (Id. at 103.)  Wally asked him if the man who walked past him was Plaintiff; he replied he was not.  (Id.)  If it had been Plaintiff, Plaintiff would have spoken to him.  (Id. at 104.)

---

[23]On cross-examination, Coleman referred to the officer as Thomas Wilder.

On cross-examination, Coleman further testified that he did not see the shooter the night Ball was shot and did not see anyone chasing Ball. (Defs. Reply-2 Ex. A at 109, ECF No. 185-1.) His statement in an affidavit that he glanced back and saw Ball "being chased by the unknown black male that had just walked by [him]" was untrue. (Id. at 112.) Police primarily asked him about the man who had walked past him. (Id. at 114.)

Wilder testified in his deposition that if Coleman had told him that he was present when Ball was shot and that the man he saw was not Plaintiff, Wilder would have recorded the information and given it to the service crew. (Pl. Resp. Ex. S at 25-26, ECF No. 180-19.)

## Discussion

Summary Judgment Standard. "Summary judgment is . . . proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" **Torgerson v. City of Rochester**, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Fed.R.Civ.P. 56(c)(2)). "The movant 'bears the initial responsibility of informing the . . . [C]ourt of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" **Id.** (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (last two alterations in original). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing a genuine issue for trial.'" **Id.** (quoting Celotex Corp., 477 U.S. at 324). The nonmovant must "explain the legal significance of [his] factual allegations beyond mere conclusory statements importing the appropriate terms of art." **Quinn v. St. Louis Cnty.**, 653 F.3d 745, 752 (8th Cir. 2011). "'The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" **Gibson v. Am. Greetings Corp.**, 670 F.3d 844, 853 (8th Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).   Evidence that is "merely colorable" or "is not significantly probative" is insufficient.  **Anderson**, 477 U.S. at 249-50.  See also **Barber v. C1 Truck Driver Training, LLC**, 656 F.3d 782, 801 (8th Cir. 2011) ("mere speculation, conjecture, or fantasy" insufficient to defeat summary judgment motion) (internal quotations omitted). Additionally, the requirement that the record be reviewed in the light most favorable to the nonmovant does not require that inadmissible hearsay be considered as evidence.  **Novotny v. Tripp Cnty, S.D.**, 664 F.3d 1173, 1178 (8th Cir. 2011).  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, [however,] not those of a judge.'"  **Torgerson**, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000)).

Section 1983 and Qualified Immunity.  As noted above, Plaintiff alleges in his amended complaint that Defendants deprived him of his constitutional right to a fair trial by suppressing exculpatory material, using improper and suggestive identification procedures, and fabricating evidence.  "To establish a claim under 42 U.S.C. § 1983, [a plaintiff] must show a deprivation of a right, privilege, or immunity secured by the Constitution or laws of the United States."  **Pace v. City of Des Moines**, 201 F.3d 1050, 1055 (8th Cir. 2000) (internal quotations omitted).  Section 1983 is "not itself a source of substantive rights," but is "a method for vindicating federal rights elsewhere conferred."  **Baker v. McCollan**, 443 U.S. 137, 144 n.3 (1979).  Thus, a court considering a § 1983 claim must "identify the

specific constitutional right allegedly infringed." **Albright v. Oliver**, 510 U.S. 266, 271 (1994).  Moreover, "the recovery of damages in a § 1983 claim requires proof that a law enforcement officer other than the prosecutor *intended* to deprive the defendant of a fair trial." **Villasana v. Wilhoit**, 368 F.3d 976, 980 (8th Cir. 2004) (emphasis added); accord **White v. McKinley**, 519 F.3d 806, 814 (8th Cir. 2008).

Plaintiff seeks to recover damages from the individual officer Defendants acting in their official and individual capacities.  He seeks to recover damages from the Board and its members acting in their official capacities.  "A plaintiff may assert § 1983 claims against a public official acting in his individual capacity and his official capacity." **Baker v. Chisom**, 501 F.3d 920, 923 (8th Cir. 2007).  "A suit against a [public] official in his . . . official capacity is 'another way of pleading an action against an entity of which an officer is an agent.'" **Id.** at 925 (quoting Monell v. Dep't of Social Services, 436 U.S. 658, 690 n. 55 (1978)); accord **Parrish v. Ball**, 594 F.3d 993, 997 (8th Cir. 2010).  "'[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official.'" **Chisom**, 501 F.3d at 923 (quoting Hafer v. Melo, 502 U.S. 21, 25 (1991)).  "Thus, to sustain the action against [the individual Defendants] in [their] official capacit[ies], [Plaintiff] must prove that the [governmental entity] *itself* caused the constitutional violation at issue." **Parrish**, 594 F.3d at 997.

"Qualified immunity protects government officials from liability under § 1983 [in their individual capacity] unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" **Molina-Gomes v.**

**Welinski**, — F.3d — , 2012 WL 1501419, * 2 (8th Cir. Apr. 30, 2012) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  "The test for whether an officer is entitled to qualified immunity depends on:  (1) whether the facts alleged by the plaintiff make out a violation of a constitutional right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." **Id.** (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)).  "A right is clearly established if a reasonable officer would understand that his conduct was unlawful." **Id.**  The sequence in which the two prongs of the qualified immunity test are addressed is discretionary with the Court.  **Pearson**, 555 U.S. at 236.  And, "'[q]ualified immunity is an affirmative defense for which the defendant carries the burden of proof.  The plaintiff[ ] must demonstrate that the law is clearly established.'" **Harrington v. City of Council Bluffs, Ia.**, — F.3d —, 2012 WL 1470266, *3 (8th Cir. Apr. 30, 2012) (quoting Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002)).  If, however, the Court concludes "that the alleged facts do not establish the violation of a constitutional right, then [it] need not address the second inquiry." **Clemmons v. Armontrout**, 477 F.3d 962, 965 (8th Cir. 2007); accord **Norris v. Engles**, 494 F.3d 634, 637, 639 (8th Cir. 2007).

Suppression of Exculpatory Evidence.  The parties vigorously dispute whether it was clearly established in 1984 that *Brady* extended to law enforcement officers.  "'In *Brady*, the Supreme Court held that 'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" **Villasana**, 368 F.3d at 978 (quoting Brady, 373 U.S. at 87).  Materially favorable evidence that must be

disclosed under *Brady* "includes both exculpatory and impeachment evidence." **Id.** (citing United States v. Bagley, 473 U.S. 667, 676 (1985)).  "However, an investigating officer's failure to preserve evidence potentially useful to the accused or their failure to disclose such evidence does not constitute a denial of due process in the absence of bad faith." **White**, 519 F.3d at 814.  Bad faith is evidenced by "official animus" against the criminal defendant or by "a conscious effort to suppress exculpatory evidence." **California v. Trombetta**, 467 U.S. 479, 488 (1984).

In its 2004 decision, the Eighth Circuit Court of Appeals held that "[t]he Supreme Court has never imposed this absolute duty [of producing all materially favorable evidence in the State's possession] on law enforcement officers other than the prosecutor." **Villasana**, 368 F.3d at 979.  See also **Clemmons**, 477 F.3d at 966 (discussing *Brady* claim in context of 1987 trial).  The court in **Villasana** rejected the § 1983 plaintiff's attempt to extend *Brady* liability "to any law enforcement officer who was part of the prosecutor's 'team.'"  368 F.3d at 980.

Even were *Brady* to apply to the officer Defendants in 1984, however, the Court finds that none withheld exculpatory material.  The exculpatory material cited by Plaintiff is Hobbs' alleged interest in Plaintiff as a suspect before he had been identified as such; Williams' description of the shooter as light-complected and her subsequent report when shown Plaintiff's photograph that he was not the shooter; and Coleman's report that Plaintiff was not the shooter.  Each of these examples is not supported by the record.

Evidence cited in support of the first example is Hobbs' alleged opinion of Plaintiff when Hobbs served as a police officer in Plaintiff's neighborhood.  Hobbs summed up that

opinion as being that Plaintiff was neither a member of an honor society or a hardened, terrible person.  He also noted that he had had no connection with Plaintiff in the eight years between his transfer from that neighborhood and Ball's murder.  Plaintiff's contention that Hobbs' opinion of him from an earlier time caused him to prejudge Plaintiff as a suspect in a murder case is mere speculation.  Nor is the speculation to be accorded any greater weight based on McCloskey's affidavit and deposition testimony.  In the affidavit – made more than ten years after he interviewed Hobbs in 2001 – McCloskey reported that Hobbs described Plaintiff as a "sh*t-ball"; however, in later deposition testimony, he reported that Hobbs described Plaintiff as a "dirt-ball."  Placing both descriptions in quotation marks does not confer either with sufficient weight to raise Plaintiff's contention above mere speculation.

Additionally, Plaintiff's argument that the officer Defendants' failure to investigate Watson as the shooter indicates their preselection of him is unavailing.  "A police officer's decisions regarding whom to investigate and how to investigate are matters that necessarily involve discretion."  **Flowers v. City of Minneapolis, Minn.**, 558 F.3d 794, 799 (8th Cir. 2009).  "To establish a constitutional violation based on inadequate investigation, [a plaintiff] must show that [the defendant's] failure to investigate was intentional or reckless, thereby shocking the conscience.  Negligent failure to investigate does not violate due process." **Cooper v. Martin**, 634 F.3d 477, 481 (8th Cir. 2011).  In **Cooper**, the Eighth Circuit found that the defendant law enforcement officer who had failed to interview any of the suspects; had joked with the minor plaintiff, who was later arrested for the crime, that he had nothing to worry about; had credited the drunk victim's sworn account of the attack rather than that of the plaintiff's father; and had misrepresented to the prosecutor that the suspects would not

cooperate, had "conducted a negligent investigation" but had not conducted an investigation in such a manner as to "rise to the level of recklessness that shocks the conscience."  634 F.3d at 481.  Similarly, in **Brockinton v. City of Sherwood, Ark.**, 503 F.3d 667, 672-73 (8th Cir. 2007), the court affirmed a grant of summary judgment to a police officer who had allegedly violated the plaintiff's due process rights by conducting an inadequate investigation into the plaintiff's alleged theft of a boat.  In conducting the investigation, the officer (a) had ignored evidence that the boat had been on the plaintiff's property longer than the purported owner had had title and that the purported owner had previously been arrested by the same officer for crimes of dishonesty, (b) had overlooked inconsistencies in a key witness's story about whether the purported owner had been involved in the sale, and (c) had failed to question a witness who had allegedly been involved in the theft when speaking with him on a related matter.  **Id.** at 671, 672.  However inadequate the officer's investigation was, the court held that it was, at best, negligent.  **Id.** at 672.  See also **Akins v. Epperly**, 588 F.3d 1178, 1184 (8th Cir. 2009) (finding that errors and inconsistencies in officers' investigation did not violate § 1983 when nothing suggested that officers purposefully ignored evidence suggesting plaintiff's innocence or ever coerced or threatened plaintiff); **Amrine v. Brooks**, 522 F.3d 823, 835 (8th Cir. 2008) (affirming grant of summary judgment in case in which plaintiff, who was released from prison after his murder conviction was set aside following state habeas proceedings, had produced no evidence that (i) defendant investigators had attempted to coerce or threaten him, (ii) investigators had purposely ignored evidence suggesting that he was innocent, and (iii) there was a systemic pressure to implicate him in face of evidence to the contrary).  At best, Plaintiff has produced evidence that Hobbs failed

to pursue Watson as a suspect after Plaintiff was identified as the shooter by two men claiming to be eyewitnesses.  This is negligence at best.  See **Id.** (investigators' failure to follow through on other leads, failure to investigate inconsistencies in eyewitness's testimony, and early focus on plaintiff as suspect did not rise above negligence and did not violate plaintiff's substantive due process rights).  See also **Folsom v. Morgan Cnty**, 2011 WL 2417009, * (W.D. Mo. June 13, 2011) (finding that § 1983 plaintiff had failed to establish a genuine issue of material fact as to whether defendant had conducted a reckless investigation into rape charges against him, although defendant had failed to investigate inconsistent descriptions of rape given by victim one year after occurrence, had not investigated whether plaintiff owned truck matching victim's description, and did not investigate alleged threats made to victim by her boyfriend that she had to report rape or he would leave her).  Cf. **Wilson v. Lawrence Cnty, Mo.**, 260 F.3d 946, 956-57 (8th Cir. 2001) (finding it to be a question for the jury whether officers conducting the five-and-one-half month post-arrest investigation after the mentally deficient plaintiff *involuntary* confessed ignored evidence (i) about an escaped felon whose *modus operandi* matched that of the homicide that included a home intrusion, tying up the victim, beating her, and then setting the house on fire and (ii) from an eyewitness who saw someone outside the house shortly before the fire and who would testify that the person was not plaintiff).  And, there is no evidence that the remaining officer Defendants, see note 2, above, had any personal involvement in the decision whether to pursue Watson as a suspect.  See **Wilson v. Northcutt**, 441 F.3d 586, 591 (8th Cir. 2006) ("Liability for damages for a federal

constitutional tort is personal, so each defendant's conduct must be independently assessed.").

As a further indication of Hobbs' alleged prejudice against Plaintiff, Plaintiff cites the use of the term "wanted subject" to refer to him in portions of the police report that described stages of the investigation that occurred before he had become the focus of the investigation.[24]  Cummings and Hobbs both explained that "wanted subject" was used to identify a suspect once a wanted had been placed for him or her.  Although neither could explain twenty-seven years after the report was written specifically how the term came to be substituted for Plaintiff's name, its use alone or combined with the retired typist's testimony does not sufficiently raise an inference that Plaintiff was purposefully preselected as the shooter to defeat summary judgment.  "Section 1983 . . . requires a causal relationship between a defendant's conduct and a plaintiff's constitutional deprivation."  **Gordon v. Hansen**, 168 F.3d 1109, 1113 (8th Cir. 1999) (per curiam).  See also **Madewell v. Roberts**, 909 F.2d 1203, 1208 (8th Cir. 1990) ("Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights."); accord **Clemmons**, 477 F.3d at 967.  Plaintiff has failed to show that the use of "wanted subject" in the police report was a reflection of the any officer Defendant's decision preselecting him as the murder and resulting in his unfair prosecution.

_____

[24]In his Statement of Material Facts, Plaintiff states that Hobbs referred to him and not to Watson as the "wanted subject" "[f]rom the very beginning of the police report."  (Pl. Stat. ¶ 34.)  There is no evidence in the record that Plaintiff was considered the "wanted subject" from the beginning of the *investigation* and no evidence to refute Cummings' and Hobbs' explanations of why and when "wanted subject" was used to refer to Plaintiff.

Also insufficient to defeat summary judgment is Plaintiff's contention that Cummings suppressed a description by Williams of the shooter as being light-complected and that Hobbs suppressed her statement that the photograph she was shown the day of trial was not that of Plaintiff.  Williams did not describe the shooter as light-complected when testifying at Plaintiff's criminal trial, even when responding to the question whether the description she had given was complete.  She did describe him as having a short Afro, consistent with her description in the police report, although she testified twenty-three years after the murder that he did not.  In that later testimony, she also stated that she *thought* she had told police the night of the murder that the shooter was light-complected.  Plaintiff's position that she *did* tell police and *did* tell Cummings at the scene is speculation unsupported by the record. Cf. **White**, 519 F.3d at 814 (finding it to be question for the jury of whether investigating officer acted in bad faith when withholding exculpatory evidence by (a) informing prosecutor he had had one date with mother of child allegedly abused by mother's husband – the defendant –  with whom mother was in heated divorce proceedings when he and the mother were in ongoing sexual relationship and knew each other before the molestation charges arose, and (b) had failed to preserve alleged victim's diary that did not corroborate molestation allegations and included entries critical of mother).

Plaintiff also speculates that Williams told Hobbs the day of trial that the photograph then shown her was not the shooter because the shooter was light-skinned.  The evidence, viewed in the light most favorable to Plaintiff, is that she told this to two men, neither of whom was Hobbs, who was called to testify after four other witnesses had and who was not in a witness room with Williams.

The police report notes that Coleman told Wilder how to contact Ball's next of kin and told the interviewing detectives he did not know who shot Ball. Coleman testified at the 2007 state habeas evidentiary hearing that he was pumping gas into his car the night of the shooting, saw a man walk past, and knew the man was not Plaintiff. He got into his car, heard gunshots, ducked down, drove off, and never looked around or in the review mirror. He did not see anyone else on the lot, although the Lindseys were there. He did not see the shooter and did not see anyone chasing Ball. Wilder testified that if Coleman had told him he was at the gas station the night Ball was shot and that the man he saw was not Plaintiff, he would have written it down. At best, Plaintiff has raised a genuine issue whether Coleman told Wilder or another individual officer Defendant that the man he saw walk past him at the gas station was not Plaintiff. The question, however, was whether Coleman told an officer that the shooter was not Plaintiff. He testified he did not see the shooter; indeed, he testified that he ducked down and drove off after hearing shots and never looked back.

Finally, any argument Plaintiff might make that Hobbs also suppressed evidence of Simmons' second plea bargain is unavailing given the lack of any evidence that he knew of the bargain.

Plaintiff has failed to adduce any evidence that any of the officer Defendants "acted intentionally, reckless, or in bad faith" when allegedly suppressing any exculpatory material. See **Clemmons**, 477 F.3d at 966. When there is no bad faith or "conscious effort to suppress exculpatory evidence," there is no due process violation. **Id.** (internal quotations omitted). "The 'Due Process Clause is simply not implicated by a *negligent act* of an official causing

unintended loss of or injury to life, liberty, or property.'" **Id.** (quoting <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986)).

Using Improper and Suggestive Identification Procedures.  Plaintiff argues that the photograph arrays shown Simmons and Walker were impermissibly suggestive and that the live line-ups were improper.

"In the context of unduly suggestive lineups, only a violation of the core right – the right to a fair trial – is actionable under § 1983." **Pace**, 201 F.3d at 1055; <u>accord</u> **Johnson v. Rollins**, 4:04cv967-SNL, 2006 WL 2546807, * 6 (E.D. Mo. Aug. 31, 2006).  "The jurisprudential doctrine described in *Manson v. Brathwaite*, 432 U.S. 98, 113 n. 13 (1977),[25] against the admission of unduly suggestive lineups is only a procedural safeguard and does not establish a constitutional right to be free of suggestive lineups." **Pace**, 201 F.3d at 1055.

In a case cited by Plaintiff, **Newsome v. James**, 2000 WL 528475, * 15-16 (N.D. Ill. Apr. 26, 2000), *aff'd*, 256 F.3d 747 (7th Cir. 2001), the district court denied two officers' motion for summary judgment arguing that they were entitled to qualified immunity on plaintiff's claim that they withheld information that they pressured two witnesses into identifying plaintiff as the shooter in a murder case.  The evidence defeating the motion

---

[25]In *Manson*, the Supreme Court adopted a two-part test for determining whether identification procedures violated a criminal defendant's due process rights.  **United States v. Murdock**, 928 F.2d 293, 297 (8th Cir. 1991).  First, the challenged confrontation must be impermissibly suggestive.  **Id.**  If so, second, the suggestive procedures must have created "'a very substantial likelihood of irreparable misidentification.'"  **Id.** (quoting <u>Manson</u>, 432 U.S. at 116).  Factors to be considered when answering this second part are "'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the time between the crime and the confrontation.'"  **Id.** (quoting <u>Manson</u>, 432 U.S. at 114).

included the two officers being in and out of the room when the witnesses were viewing the line-up, one witness's testimony that the officers in the room "repeatedly encouraged" him and the other witness to identify plaintiff as the murderer, and a third witness's testimony that the phototograph array shown him was suggestive.  In the instant case, however, there is no evidence that either Walker or Simmons was encouraged to select Plaintiff in the photographic arrays or the live line-ups as the shooter.

Citing the opinion of his police practices expert, Michael D. Lyman, Ph.D., Plaintiff argues that showing a photographic array of less than six photographs violated established police procedures in 1984.  In **Murdock**, 928 F.2d at 297, the Eighth Circuit held that *single* photograph arrays are considered impermissibly suggestive.[26]  The trial judge in Plaintiff's criminal trial found neither set of photograph arrays to be impermissibly suggestive.  (See Defs. Mem.-2 Ex. A at 414-15, ECF No. 171-2.)  Moreover, any failure of Hobbs to tell Walker that he did not have to choose a photograph and that the shooter's photograph might not be included in the array does not rise above negligence, particularly given Walker's statement that he knew the shooter.

There is no showing that Cummings, Nichols, Gunter, or Wilder were involved in any way in either photograph array.  See **Briscoe v. St. Louis Cnty.**, 2010 WL 3905339, * 5 (E.D. Mo. Sept. 27, 2010) (finding that defendant in § 1983 claim alleging that plaintiff's conviction – set aside after exculpatory evidence was found twenty-three years later – was

---

[26]The court further held that the identification at issue was not unreliable, however, under the totality of circumstances.  **Id.**

caused, in part, by suggestive photograph array was entitled to summary judgment when defendant had no direct involvement in array).

Moreover, Nichols, Gunter, Wilder, and Cummings were not present at the live line-up when Simmons selected Plaintiff.  Hobbs was present, as was Simmons' attorney.  Hobbs, Cummings, Gunter, and Wilder were not present at the live line-up when Walker selected Plaintiff.  Nichols was.  There has been no showing that Gunter, Wilder, and Cummings had any personal involvement in either line-up.  See **Briscoe**, 2010 WL 3905339 at * 6 (granting summary judgment to § 1983 defendant who had not participated in forming lineup and was not present when it occurred).  Nor has there been any showing that Hobbs made any comment to Simmons at that line-up or Nichols made any comment to Walker at his line-up.  See **Id.** (granting summary judgment to § 1983 defendant when there was no evidence an officer's statements to rape victim her at lineup were made by him, although he had been present at lineup).

Fabrication of Evidence.  Plaintiff next contends that Hobbs fabricated evidence of how Walker came to identify Plaintiff.  Hobbs testified that his partner was told by an informant that a man he knew also knew who had shot Ball.  Hobbs then spoke with this man, Walker, who identified Plaintiff in a photograph array and in a live line-up.  Based on the affidavit and testimony of McCloskey that Hobbs learned of Walker after approaching some "winos" on a front porch, Plaintiff argues that Hobbs purposefully elicited identification from a man known to be unreliable.

"If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process rights are violated."  **Wilson**, 260 F.3d at 954.  See also **Hedges v.**

- 41 -

**Poletis**, 177 F.3d 1071, 1075 (8th Cir. 1999) ("[I]f material information in the [police report] was known by [defendant] to be false, or if he had no reasonable basis for believing it, then it was not objectively reasonable for him to use it"). In **Mueller v. Tinkham**, 162 F.3d 999 (8th Cir. 1998), the question of a witness's reliability was addressed when officers sued under § 1983 moved for summary judgment. The plaintiffs in that case were a couple whose house had been forcibly entered by a tactical response team and searched while the couple was restrained at gunpoint. The search was the result of information about a man named Terry Vaught from an informant (a) who spoke with officers in an attempt to gain leniency for pending state charges, (b) who never produced, although repeatedly asked to, the illegal firearm he allegedly obtained from Vaught, (c) whose mother told the officers during the investigation that he was a pathological liar and should not be believed, and (d) who admitted to the officers that he had lied about the firearm. **Id.** at 1001-02.  This informant told officers that Vaught lived at certain address; information learned by the officers before the search warrant was executed showed otherwise. **Id.**  Regardless, the officers executed the search warrant at the address given by the informant and occupied by the couple. **Id.** at 1002.  Additionally, one of the defendant officers attested that the informant had given them reliable information in the past; the informant stated he had never before provided any information. **Id.** at 1003.  The court found that the officers were properly denied qualified immunity, holding that "because the officers knew of the conflicting information concerning [the informant's] truthfulness, there remains a question of whether they acted in an

objectively reasonable manner regarding their application for the search warrant[27]. . . ." **Id.**
(footnote added).

The instant case, however, is more similar to the situation in **Amrine v. Brooks**, 2007
WL 436087 (W.D. Mo. 2007), *aff'd*, 522 F.3d 823 (8th Cir. 2008), where the district court
granted summary judgment to officers who allegedly violated the § 1983 plaintiff's right to
a fair trial by a reckless investigation, failure to preserve evidence, and fabrication of false
testimony.  The court noted that the evidence of the two eyewitnesses was inconsistent but
not obviously false.  **Id.** at * 11.  The one eyewitness's identification of the plaintiff as the
murderer was "irregular and troubling, but to the extent that there was willful fabrication
involved, [the witness] was the culpable party." **Id.**  "[N]o reasonable juror would find that
the [two officer defendants] tried to get [the witness] to make an identification that they
thought was false.  Similarly, the evidence that [the one officer] elicited a statement from [the
witness] does not show any attempt to convince [the witness] of something [the officer]
knew to be false." **Id.**

In the instant case, Hobbs was told by Walker that he could identify who shot Ball;
Walker then identified Plaintiff as the shooter.  There is no evidence that Hobbs knew this
testimony to be false.[28]

Conspiracy.  Plaintiff additionally alleges that the individual officer Defendants
conspired with one another to deprive him of a fair trial.

---

[27]The known information about the informant lying about possessing the weapon and about
his mother describing him as a pathological liar had not been included in the warrant application.

[28]The Court assumes for purposes of the instant motion that Walker's identification was not
truthful.

"To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show:  (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff."  **White**, 519 F.3d at 814.  "The question of the existence of a conspiracy to deprive the plaintiff[ ] of [his] constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims."  **Id.** at 816 (internal quotations omitted).  "The plaintiff is additionally required to prove[, however,] a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim."  **Id.** at 814.  The joint pursuit of an investigation by law enforcement officers based on a belief that a suspect is guilty does not constitute an unlawful conspiracy.  **Reasonover v. St. Louis Cnty., Mo.**, 447 F.3d 569, 582 (8th Cir. 2006).

At best, Plaintiff has established that, based on information learned during the investigation into Ball's murder, the officer Defendants mistakenly believed Plaintiff to be the murderer.  Plaintiff has failed, however, to establish a genuine issue of material fact whether he was deprived of a fair trial; consequently, his conspiracy claims fail.

The Board and Its Members.  "'[I]n order for municipal liability to attach, individual liability must first be found on an underlying substantive claim.'"  **Cooper v. Martin**, 634 F.3d 477, 481-82 (8th Cir. 2011) (quoting Brockinton, 503 F.3d at 672 (alteration in original); accord **Brodnicki v. City of Omaha**, 75 F.3d 1261, 1266 (8th Cir. 1996).

Plaintiff's failure to establish that the individual officer Defendants violated the Constitution requires the dismissal of his claims against the Board and its members.  See

- 44 -

**Reasonover**, 447 F.3d at 582-83 (affirming dismissal of § 1983 claims against St. Louis Board of Police Commissioners for failure to properly train officers when plaintiff failed to establish that individual law enforcement defendants had committed an unlawful act); accord **Cook v. City of Bella Villa**, 582 F.3d 840, 853 (8th Cir. 2009); **Sanders v. City of Minneapolis, Minn.**, 474 F.3d 523, 527 (8th Cir. 2007).

State Law Claims in Counts IV and V.  "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'"  **Missouri Roundtable for Life v. Carnahan**, 676 F.3d 665, 678 (8th Cir. 2012) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)) (alteration in original).  "[W]here . . . resolution of the remaining claims depends solely on a determination of state law, the Court should decline to exercise jurisdiction." **Glorvigen v. Cirrus Design Corp.**, 581 F.3d 737, 743 (8th Cir. 2009) (internal quotations omitted). The remaining claims and related issues, including whether Plaintiff's claim of malicious prosecution is barred by the application of Missouri's Public Duty Doctrine, depend on an application of state law to the developed facts.  Because Defendants are entitled to summary judgment on Plaintiff's § 1983 claims – the basis for the Court's exercise of federal jurisdiction – the Court declines to exercise supplemental jurisdiction over the state law claims in Counts IV and V of his amended complaint.

## Conclusion

Evidence discovered subsequent to Plaintiff's trial for the murder of Donald Ball suggests that he has served a long incarceration for a crime he did not commit.  However

- 45 -

unjust this is is not for this Court to redress in the absence of a violation of his constitution right to a fair trial by the named Defendants.  See **Baker**, 443 U.S. at 145 ("The Constitution does not guarantee that only the guilty will be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted – indeed, for every suspect released.").  "'Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.'" **Id.** (quoting Patterson v. New York, 432 U.S. 197, 208 (1977)).

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that the motion of Thomas Wilder for summary judgment [Doc. 168] is **GRANTED** as to the 42 U.S.C. § 1983 claims in Counts I, II, and III of the amended complaint and is **DENIED** without prejudice as to the state law claims in Counts IV and V.

**IT IS FURTHER ORDERED** that the motion of Christopher Gunter for summary judgment [Doc. 168] is **GRANTED**.

**IT IS FURTHER ORDERED** that the motion of Donald Cummings, Stephen Hobbs, Daniel Nichols, the St. Louis City Board of Police Commissioners, Francis G. Slay, Michael L. Gerdine, Bettye Battle-Turner, and Richard H. Gray for summary judgment [Doc. 170] is **GRANTED** as to the 42 U.S.C. § 1983 claims in Counts I, II, and III of the amended complaint and is **DENIED** without prejudice as to the state law claims in Counts IV and V.

**IT IS FURTHER ORDERED** that the motion of plaintiff Darryl Burton to bar use of late-disclosed evidence and discovery topics [Doc. 149] and the motion of Defendants to exclude expert testimony [Doc. 161] are each **DENIED** without prejudice.

**IT IS FINALLY ORDERED** that the motion of plaintiff Darryl Burton for a writ of habeas corpus ad testificandum [Doc. 195] is **DENIED** as moot.

An appropriate Order shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  29th  day of May, 2012.