# United States Court of Appeals
## For the Eighth Circuit

No. 12-2524

Darryl Burton

*Plaintiff - Appellant*

v.

St. Louis Board of Police Commissioners; Francis G. Slay, in his official capacity as a member of the St. Louis City Board of Police Commissioners; Michael Gerdine, in his official capacity asa member of the St. Louis City Board of Police Commissioners; Bettye Battle-Turner, in her official capacity as a member of the St. Louis City Board of Police Commissioners; Richard H. Gray, in his official capacity as a member of the St. Louis City Board of Police Commissioners; Don Cummings; Christopher Gunter; Stephen Hobbs; Daniel Nichols; Thomas Wilder, all in their official capacity and their individual capacity

*Defendants - Appellees*

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

Submitted: March 12, 2013
Filed: September 24, 2013

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

SMITH, Circuit Judge.

Darryl Burton was convicted of the 1984 murder of Donald Ball in St. Louis, Missouri. Burton served 24 years in prison before a Missouri court found that his trial had been fundamentally unfair and ordered his release. Burton then filed this action in the district court[1] against the members of the St. Louis Board of Police Commissioners and several law enforcement personnel (collectively, "defendants"), asserting that the defendants recklessly or intentionally manipulated evidence and conducted suggestive identification procedures, in violation of his Sixth Amendment right to a fair trial, his Fourteenth Amendment right to substantive due process, and 42 U.S.C. § 1983. The complaint also alleged state law claims of malicious prosecution and infliction of emotional distress. The defendants asserted the defense of qualified immunity and moved for summary judgment. The district court granted the defendant's summary judgment motion on the § 1983 claims and dismissed the remaining state law claims. Finding no genuine issue of material fact with respect to Burton's § 1983 claims, we now affirm.

## I. *Background*

On June 4, 1984, a gunman shot and killed Ball at an Amoco service station in St. Louis, Missouri. Detective Donald Cummings interviewed three people at the scene who allegedly saw the shooter: Carolyn Lindsey, Stacy Lindsey, and Joan Williams. Officer Thomas Wilder arrived at the scene and interviewed Samuel Coleman, who did not witness the shooting but was present at the scene when the shooting took place. The following day, Detective Stephen Hobbs took over the murder investigation. Detective Hobbs quickly focused on Burton as a suspect. Police arrested Burton, and the State charged him with murder and armed criminal action. In March 1985, a jury convicted Burton based, in substantial measure, on eyewitness

---

[1]The Honorable Thomas C. Mummert, III, United States Magistrate Judge for the Eastern District of Missouri, to whom the case was referred for disposition by consent of the parties pursuant to 28 U.S.C. § 636 and Eastern District of Missouri Local Rule 2.08.

testimony from Claudex Simmons and Eddie Walker, both of whom testified that Burton was the gunman. The court sentenced Burton to 75 years' imprisonment.

Five months later, Simmons signed an affidavit, in which he stated that he "submitted perjury testimony to gain immunity, from the . . . murder of one Donald Ball." He swore that he "made an agreement with one Anthony Gonzalez to testify against one Darryl Burton-Bey. For exchange of immunity of the homocide [sic] of/upon one Donald Ball." Simmons claimed that he "didnot [sic] witness [Burton] murder one Donald Ball." Burton appealed his conviction, and the Missouri Court of Appeals affirmed. *See State v. Burton*, 710 S.W.2d 306 (Mo. Ct. App. 1986). Burton filed for post-conviction relief in the trial court, but the court denied relief. The Missouri Court of Appeals affirmed the denial on appeal. *See Burton v. State*, 817 S.W.2d 928 (Mo. Ct. App. 1991).

Walker died in 1996, but Burton's investigators obtained a statement from Daniel Pennington, one of Walker's friends. "Pennington said he had been drinking with Walker outside another friend's house near the Amoco station at the time of Ball's murder." *Burton v. Dormire*, 295 F.3d 839, 843 (8th Cir. 2002). Pennington signed an affidavit stating, "If Eddie Walker said that he saw the shooting and could identify the shooter that night, he was lying. It [wa]s physically impossible for any of us to see the [Amoco] lot and the area of the shooting from where we were standing." *Id.* (quotation omitted) (second alteration in original). Furthermore, "Pennington and other affiants claimed Walker was a notorious liar. And one woman even asserted [that] Walker had poor eyesight and never wore his glasses while drinking." *Id.* Burton then sought federal habeas relief. The district court denied relief, and Burton appealed to this court. On review of the district court's denial of Burton's petition, we stated:

> Darryl Burton's habeas petition depicts a troubling scenario. One cannot read the record in this case without developing a nagging suspicion that the wrong man may have been convicted of capital murder and armed criminal action in a Missouri courtroom. Burton was convicted on the

> strength of two eyewitness accounts. Since his trial and imprisonment, new evidence has come to light that shakes the limbs of the prosecution's case. One eyewitness has recanted and admitted perjury. The other eyewitness's veracity has been questioned by a compatriot who avers it was physically impossible for him to have seen the crime. A layperson would have little trouble concluding Burton should be permitted to present his evidence of innocence in *some* forum. Unfortunately, Burton's claims and evidence run headlong into the thicket of impediments erected by courts and by Congress. Burton's legal claims permit him no relief, even as the facts suggest he may well be innocent. Mindful of our obligation to apply the law, but with no small degree of reluctance, we deny Burton a writ.

*Id.* at 842.

Next, Burton filed a state habeas petition. The Missouri trial court found that Burton's trial had been fundamentally unfair and ordered Burton's release from prison. *See Burton v. Dormire*, No. 06AC-CC00312 (Mo. Cir. Ct. Aug. 18, 2008). After 24 years of incarceration, Burton was released.

Burton then filed this action in the district court against the defendants, including Detective Hobbs, Detective Cummings, Officer Wilder, Detective Daniel Nichols, and Officer Christopher Gunter. Burton's first amended complaint asserted that the defendants withheld exculpatory material, conducted suggestive identification procedures, and fabricated evidence, in violation of his Sixth Amendment right to a fair trial and 42 U.S.C. § 1983. The complaint also alleged state law claims of malicious prosecution and infliction of emotional distress. The defendants asserted the defense of qualified immunity and moved for summary judgment. The district court granted summary judgment to the defendants on the § 1983 claims, stating:

> Evidence discovered subsequent to Plaintiff's trial for the murder of Donald Ball suggests that he has served a long incarceration for a crime he did not commit. However unjust this is [it] is not for this Court to

> redress in the absence of a violation of his constitution[al] right to a fair trial by the named Defendants. *See Baker* [*v. McCollan*], 443 U.S. [137,] 145 [(1979)] ("The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released."). "'Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.'" *Id.* (quoting *Patterson v. New York*, 432 U.S. 197, 208 (1977)).

*Burton v. St. Louis Bd. of Police Comm'rs*, No. 4:1-CV1540 TCM, 2012 WL 1933761, at *23 (E.D. Mo. May 29, 2012). The district court dismissed the remaining state law claims without prejudice.[2]

## II. *Discussion*

On appeal, Burton argues that the district court erred in granting summary judgment to the defendants. Burton contends that the court improperly rejected his evidence and credited the defendants' denials that they did not manipulate the evidence, conduct suggestive identification procedures, or conspire to deprive him of a fair trial. Burton argues that he "provided considerable evidence indicating that Hobbs, working with Nichols, Cummings, and Wilder, framed Mr. Burton for a crime he did not commit."

> "Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We review de novo summary judgment where granted on the basis of qualified immunity." *Coates v. Powell*, 639 F.3d 471, 475–76 (8th Cir.) (internal citation omitted), *cert. denied*, ___ U.S. ___, 132

---

[2]Burton's brief offers no independent argument that the district court erred in dismissing the state law claims. "Claims not argued in the briefs are deemed abandoned on appeal." *Etheridge v. United States*, 241 F.3d 619, 622 (8th Cir. 2001) (citing *Jasperson v. Purolator Courier Corp.*, 765 F.2d 736, 740–41 (8th Cir. 1985)).

> S. Ct. 412, 181 L. Ed. 2d 269 (2011). "The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008).
>
> "Qualified immunity shields government officials from [personal] liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). Evaluating a claim of qualified immunity requires a "two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* at 496 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). "The defendants are entitled to qualified immunity unless the answer to both of these questions is yes." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012). A court may exercise its discretion in deciding which of the two prongs of the qualified immunity analysis to take up first. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

*Winslow v. Smith*, 696 F.3d 716, 730–31 (8th Cir. 2012) (alteration in original). "'The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences.'" *Id.* at 730 (quoting *White*, 519 F.3d at 813).

### A. *Manipulation-of-Evidence Claim*s

Burton argues that the defendants recklessly or intentionally manipulated exculpatory evidence, in violation of his Sixth Amendment right to a fair trial, his Fourteenth Amendment right to substantive due process, and 42 U.S.C. § 1983. Specifically, Burton contends that the defendants withheld the statements of witnesses Coleman and Williams that Burton was not the shooter by failing to include them in the police report. Furthermore, he contends that the defendants recklessly or

intentionally manipulated the testimony of key witnesses Walker and Simmons and withheld evidence of that manipulation. Finally, Burton argues that Detective Hobbs acted in bad faith by exclusively pursuing him as a suspect. "The general test of whether executive action denying a liberty interest is egregious enough to violate due process is whether it shocks the conscience." *Briscoe v. Cnty. of St. Louis, Mo.*, 690 F.3d 1004, 1011 (8th Cir. 2012) (quoting *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 956 (8th Cir. 2001)).

> [A]n investigating officer's failure to preserve evidence potentially useful to the accused or their failure to disclose such evidence does not constitute a denial of due process in the absence of bad faith. *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004). "[T]he recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial." *Id.* Consequently, to be viable, [the defendant's] claim must allege bad faith to implicate a clearly established right under *Brady*.

*White*, 519 F.3d at 814 (second alteration in original).

Burton first argues that the defendants withheld exculpatory evidence provided by Coleman. Coleman was at the scene during the shooting, but he did not witness it. During Burton's state habeas proceeding, Coleman testified that, as he was getting into his car to leave, he saw a man with a "medium complexion" walk past him just before the shooting—and that man was not Burton. Additionally, Coleman testified in response to questioning as follows:

> Q. Did you hear the gunshots as you turned your key in the ignition?
>
> A. Yes,[] ma'am.
>
> Q. And when you heard those shots, what did you do at that moment?
>
> A. Put the car in drive and ducked down and pulled off.

Q. Did you look around you?

A. No, I wasn't even trying. I was trying to get off the lot.

* * *

Q. As you were driving off, did you turn around and look at the lot or look in your rearview mirror?

A. No, ma'am.

Q. Did you look in your rearview mirror?

A. I didn't look in no mirror. I almost took a car off trying to get around the corner.

* * *

Q. When you say you ducked as you drove out, were you still able to see out the windshield?

A. No, ma'am. I ducked down, like this and just tried to get off the lot.

Burton contends that, on the night of the shooting, Coleman told Officer Wilder that the man who walked past him immediately before the shooting was not Burton. Nevertheless, he argues, the defendants did not include Coleman's statement in the police report. Addressing the omission of Coleman's statement to police, the district court found:

> At best, Plaintiff has raised a genuine issue whether Coleman told Wilder or another individual officer Defendant that the man he saw walk past him at the gas station was not Plaintiff. The question, however, was whether Coleman told an officer that *the shooter* was not Plaintiff. *He*

> *testified he did not see the shooter*; indeed, he testified that he ducked down and drove off after hearing shots and never looked back.

*Burton*, 2012 WL 1933761, at *20 (emphases added). Coleman told Officer Wilder that the man he saw was not Burton, but he also said that he did not see *who* did the shooting. Thus, Coleman did not know if the man he saw was the shooter, and, hence, he was not able to say that *Burton* was *not* the shooter. As such, Coleman's statement is not material to the issue of Burton's guilt or innocence, and it does not support Burton's *Brady* claims here. *See United States v. Tate*, 633 F.3d 624, 630–31 (8th Cir. 2011) ("To establish a *Brady* violation, a defendant is required to show that . . . the [suppressed] evidence was material" "either to guilt or to punishment."). Coleman's statement becomes material to the issue of Burton's guilt or innocence only if one assumes that the man that Coleman saw was the shooter. The police report did not make this assumption, but simply stated that Coleman "is unaware of who may have shot the victim." At most, a different report could have stated that Coleman saw someone other than Burton who might have been the shooter. To conclude that Officer Wilder or Detective Hobbs purposefully withheld Coleman's statement that the man he saw was not Burton would "require[] us to draw inference upon inference in order to conclude there might be a material fact issue lurking somewhere. We decline to do so, as did the District Court." *See ACT, Inc. v. Sylvan Learning Sys., Inc.*, 296 F.3d 657, 667 (8th Cir. 2002).

Second, Burton argues that the defendants withheld evidence provided by another eyewitness, Williams, whom he claims gave Detective Cummings a statement that the shooter was "an African/American . . . with . . . light skin." Burton argues that this statement was exculpatory because he is dark-complected. In May 2004, Williams signed an affidavit that states:

> 8. Even though I did not get a close look at the shooter's face, I did clearly see his complexion. At some point, I remember telling the police that the man they had charged with the murder was the wrong man,

> because the man they charged had a darker complexion than the man I saw do the shooting. When I told the police they had charged the wrong man, no one said a word.
>
> 9. When I testified at a trial several months after the shooting, I looked at the defendant. I knew he was darker than the man I saw do the shooting. But I was not asked during my testimony if the man in the courtroom was the assailant. Also, I figured the police must know what they were doing and I let it go at that.
>
> 10. During my testimony, I was asked about the shooter's general description but I was not asked about the shade of his complexion. I knew that the man in the courtroom was not the man I saw doing the shooting on the Amoco lot because he was darker than the shooter. I was afraid, however, to say the defendant was the wrong man because I was never asked a direct question about that.

Williams also testified during Burton's state habeas proceeding as follows:

> [THE WITNESS:] I saw his face just a hot second because he was nice looking, a real nice looking guy and light skinned and had a low haircut.
>
> THE COURT: And you gave that description to the police?
>
> THE WITNESS: Yes, I did, sir.
>
> THE COURT: And you believed he was an African/American?
>
> THE WITNESS: Oh, yes. He was an African/American, but with just light skin.

The district court found that "Plaintiff's position that [Williams] *did* tell police and *did* tell [Detective] Cummings at the scene [that the shooter was light-skinned] is speculation unsupported by the record." *Burton*, 2012 WL 1933761, at *19. The court

noted that "Williams did not describe the shooter as light-complected when testifying at Plaintiff's criminal trial, even when responding to the question whether the description she had given was complete." *Id.* Even if Williams did tell police at the scene that the shooter was "an African/American . . . with . . . light skin," and the statement had been in the police report, the statement would have been included along with eyewitness Stacy Lindsey's description of the shooter as having "medium skin" color. It is not reasonable to infer an intent to frame Burton from the simultaneous (1) inclusion of Stacy Lindsey's description and (2) non-inclusion of Williams's description in the police report. We also note that Williams's statement that police had the "wrong man, because the man they charged had a darker complexion than the man [she] saw," could not have been withheld by the defendants because Williams did not make that statement until the day she was called to testify as a witness in Burton's trial.

Next, Burton argues that the defendants manipulated key witnesses and withheld evidence of that manipulation. First, he contends that Detective Hobbs manipulated Walker's testimony. Burton relies on an affidavit of Jim McCloskey,[3] signed in October 2011, which relates McCloskey's description of an interview he conducted with Detective Hobbs over ten years earlier, in February 2001. McCloskey's affidavit states that Detective Hobbs

---

[3]As the district court noted,

> McCloskey describes himself as the founder and executive director of Centurion Ministries. Centurion Ministries is described on its website as an organization whose "mission is to free from prison those innocent individuals who had absolutely nothing whatsoever to do with the crimes for which they were convicted and sentenced to either life or death."

*Burton*, 2012 WL 1933761, at *8 n.15 (citations omitted).

> remembered that Darryl Burton's name came up right away as a suspect. Lt. Hobbs remembered shortly after the murder, perhaps the very next day, he was canvassing the neighborhood during the day and he came upon a house . . . . Sitting on the front porch were three or four winos; Lt. Hobbs asked them if they knew [Burton].

McCloskey's affidavit avers that Detective Hobbs stated that "he and his partner gave out their cards. One came to them later and said that he knew who was the killer. Lt. Hobbs didn't remember the name 'Eddie Walker,' but remembered that an important witness against Darryl Burton was one of the winos." The police report does not mention any encounter with the so-called winos or that Walker was among them. Rather, the report describes Sergeant Herbert Riley's conversation with Walker on the street at 12:30 p.m. on June 6. According to the report, Walker told Sergeant Riley that he saw Burton shoot Ball. Sergeant Riley then called Detective Hobbs, who showed Walker a photo array. The report states that Walker identified Burton's photo as the picture of the shooter and that Walker said that he had known Burton for ten years. Burton argues that McCloskey's affidavit shows that Detective Hobbs fed Burton's identity to Walker during the encounter with the winos, thereby knowingly causing Walker to subsequently identify Burton as the shooter.

Burton's argument rests on McCloskey's 2011 affidavit. The document contains McCloskey's recollection of statements Detective Hobbs made to him over ten years earlier about events that occurred another seventeen years before that. Notably, Detective Hobbs's hearsay statements do not identify Walker as the "important witness." The only statements in the affidavit that identify Walker as the witness are McCloskey's own editorial comments. McCloskey's affidavit simply does not create an issue of material fact regarding whether the defendants manipulated Walker's testimony. The district court found that Detective "Hobbs was told by Walker that he could identify who shot Ball; Walker then identified Plaintiff as the shooter. There is no evidence that Hobbs knew this testimony to be false." *Burton*, 2012 WL 1933761, at *22. We agree.

Burton also argues that Detective Hobbs manipulated Simmons's testimony to implicate Burton and then concealed that manipulation from the prosecution. Burton contends that Simmons was near the scene of the crime at the time of the shooting and initially denied seeing Burton there. Despite Simmons's initial denial, according to Burton, Detective Hobbs coached Simmons to change his story and identify Burton as the shooter after Detective Anthony Rice arrested Simmons for attempted second-degree robbery on June 11. According to the police report, on June 7, Simmons

> stated that he was coming out of the liquor store next to the Amoco Station . . . and heard three shots. At that time, he ran across [the street] to the bus stop. After the shooting was over, he went to the Amoco Station to look at the victim, to see if he knew the victim. . . .
>
> [Simmons] stated that he did not see the wanted subject . . . .

However, the police report further states:

> Continuing the investigation, on Monday, June 11, 1984, Detectives Hobbs and Daniel Nichols, dsn-0014, were contacted by Det. Anthony Rice, dsn-6790, assigned to the Fourth District Detective Bureau. Det. Rice stated that he had arrested a subject who stated that he had witnessed the murder and wanted to talk to Homicide detectives.

At that time Simmons gave a different account:

> [Simmons] stated that earlier he had told Det. Hobbs that he heard the shots, but did not see anything. He added that he was very scared and did not want to get involved.
>
> He stated that he was in the liquor store, and as he was leaving, he heard three shots coming from the service station lot. As he looked, he saw the victim running with the wanted subject chasing him. Simmons added that the victim fell and the wanted subject stood over him and was holding a

> handgun in his right hand, which he put in his right front shirt pocket. At that time, the wanted subject ran to the northwest corner of the lot, and out of sight. Simmons then ran south across [the street] to the bus stop. A few minutes later, Simmons returned to the lot to see if he knew the victim. . . .
>
> Simmons stated that the wanted subject had his hair in "corn rolls," and was wearing blue jeans and an unknown color shirt that had pockets on the sides.
>
> Simmons stated that he did not know the wanted subject, but if he saw a photo, he might be able to identify him.
>
> At that time, Simmons was shown four LB photographs . . . . Simmons positively identified [Burton] as the subject he saw standing over the victim, placing the handgun into his right shirt pocket, who had been chasing the victim on the lot.

Five months after Burton's conviction, Simmons signed an affidavit in which he stated that he "submitted perjury testimony to gain immunity, from the . . . murder of one Donald Ball." He swore that he "made an agreement with one Anthony Gonzalez to testify against one Darryl Burton-Bey. For exchange of immunity of the homocide [sic] of/upon one Donald Ball." Simmons claimed that he "did not witness [Burton] murder one Donald Ball." His affidavit makes no allegation that his testimony against Burton was coerced. Nevertheless, Simmons subsequently testified during the state habeas proceeding that "[he] was coerced by the prosecuting attorney and the arresting officer." He testified that "[t]he prosecuting attorney[,] I think his name is Kowosky (phonetic sp)" was "telling [him] what to say."

Burton argues that Simmons's reference to "the arresting officer" who "coerced" him is a reference to Detective Hobbs. But drawing that conclusion requires inferring both (1) that Simmons was referring to *Burton's* "prosecuting attorney and . . . arresting officer" (as opposed to his own) and (2) that Simmons understood

*Detective Hobbs* to be Burton's arresting officer. But these two inferences are neither reasonable nor consistent with the record. As the district court noted, "Simmons did not identify [Detective Hobbs as] the arresting officer, nor is there any evidence that [Simmons] was present when [Burton] was arrested or even knew who had arrested [Burton]." *Burton*, 2012 WL 1933761, at *8. Moreover, the police report indicates that Simmons changed his story *before* speaking to Detective Hobbs on June 11. That report—the only evidence in the record on this point—states that Simmons told Detective Rice "that he had witnessed [Ball's] murder and wanted to talk to Homicide detectives." Burton has not shown a genuine issue of material fact that Detective Hobbs intentionally manipulated Simmons's testimony.

Finally, Burton argues that Detective Hobbs acted in bad faith in pursuing him as a suspect. He maintains that Detective Hobbs knew him as a teenager and viewed him negatively. He argues that Detective Hobbs investigated him exclusively, even though another man, Jesse Watson, was the more likely suspect. But even if Detective Hobbs failed to follow through on investigating other possible leads after identifying Burton as a suspect, Burton produces no evidence showing that Detective Hobbs purposefully ignored contrary evidence, recklessly or intentionally withheld evidence, or faced pressure to unduly strengthen the case against Burton. We agree with the district court that Detective Hobbs's investigation was, on this evidence, at most, negligent. *See Burton*, 2012 WL 1933761, at *18. As such, Burton has not shown that a genuine issue of material fact remains that Detective Hobbs's investigation violated his Sixth Amendment right to a fair trial or his Fourteenth Amendment right to substantive due process. *See Akins v. Epperly*, 588 F.3d 1178 (8th Cir. 2009) (finding no § 1983 violation where the evidence failed to establish that officers either purposefully ignored evidence supporting the arrestee's innocence, intended to misconstrue evidence, or were pressured to improperly strengthen the state's case against the arrestee); *Amrine v. Brooks*, 522 F.3d 823, 835 (8th Cir. 2008) (affirming summary judgment where, although the officers failed to follow through on investigating other leads, the evidence did not establish that officers either attempted

to coerce the arrestee, purposely ignored contrary evidence, or faced undue pressure to implicate arrestee).

Consequently, the district court did not err in granting summary judgment on Burton's claims that the defendants manipulated the investigation or evidence against him or deprived him of a fair trial, in violation of his constitutional rights.

B. *Suggestive-Identification-Procedure Claims*

Burton argues that the defendants violated his Sixth Amendment right to a fair trial and his Fourteenth Amendment right to substantive due process by employing impermissibly suggestive and unreliable identification procedures with witnesses Walker and Simmons. He argues that the individuals depicted in photo arrays presented to Walker and Simmons did not have similar physical characteristics and that Detective Hobbs failed to advise the witnesses that the perpetrator may or may not be represented among the photos shown.

> "In the context of unduly suggestive lineups, only a violation of the core right—the right to a fair trial—is actionable under § 1983." *Pace v. City of Des Moines*, 201 F.3d 1050, 1055 (8th Cir. 2000). An identification procedure violates that core right if it is "both impermissibly suggestive *and* unreliable." *United States v. Martinez*, 462 F.3d 903, 911 (8th Cir. 2006), *quoting United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998). "An identification is unreliable if its circumstances create a very substantial likelihood of irreparable misidentification." *King*, 148 F.3d at 970. In determining reliability, courts examine the totality of the circumstances including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

*Briscoe*, 690 F.3d at 1012. The evidence at trial established that Walker and Simmons picked Burton out from separate photograph arrays.[4] The photograph array that Detective Hobbs presented to Walker is not in the record on this appeal, but it included from six to eight[5] photos. *See, e.g.*, *United States v. Granados*, 596 F.3d 970, 975 (8th Cir. 2010) (holding a six-photo array to be not impermissibly suggestive); *Schawitsch v. Burt*, 491 F.3d 798, 803 (8th Cir. 2007) (same). Walker told police prior to viewing the photos that he had witnessed Burton shooting Ball. He stated that he was present on the Amoco station lot when the shooting took place. Walker's statement was detailed, indicating a high degree of attention, and his identification of Burton as the shooter was further supported by his statement that he had known Burton for the last ten years. Walker's identification of Burton from the photo array occurred two days after the shooting. Burton has not adduced evidence to show that this identification procedure was impermissibly suggestive. Moreover, the evidence indicates that the "'circumstances [of Walker's photo identification procedure did not] create a very substantial likelihood of irreparable misidentification.'" *Briscoe*, 690 F.3d at 1012 (quoting *King*, 148 F.3d at 970).

Seven days after the shooting, Detective Hobbs presented Simmons with a four-photo array. Simmons's photo array is in the record. It includes portrait- and profile-shots of four young black males of roughly similar build and skin complexion. The individuals depicted differ primarily in hair style and facial hair. "Reasonable variations in hair length and facial hair are not impermissibly suggestive, especially as they can vary on any given person at different times." *Schawitsch*, 491 F.3d at 803. "'When there are no differences in appearance tending to isolate the accused's

---

[4]We note that the judge in Burton's criminal trial admitted both photo arrays into evidence over his objection.

[5]The police report and Detective Hobbs's trial testimony indicate that he used an eight-photograph array with Walker. Nevertheless, Walker testified that he thought "[i]t was about—I think about six of them, I guess."

photograph, the identification procedure is not unnecessarily suggestive.'" *Id.* at 802 (quoting *United States v. Mays*, 822 F.2d 793, 798 (8th Cir. 1987)) (citing *United States v. Wilson*, 787 F.2d 375, 385 (8th Cir. 1986) (photo spread not unnecessarily suggestive where suspect was the only Hispanic included in the display)). Even assuming, without deciding, that Simmons's photo identification procedure was impermissibly suggestive, we hold that the "'circumstances [of that procedure did not] create a very substantial likelihood of irreparable misidentification.'" *Briscoe*, 690 F.3d at 1012 (quoting *King*, 148 F.3d at 970). The evidence established that on June 11, Simmons changed his story after Detective Rice arrested him for attempted second-degree robbery. Simmons then claimed that he *did* see the shooting but was afraid to get involved. Simmons was in custody when he identified Burton from the photo array, and he later claimed that "[he] was coerced by . . . the arresting officer" into implicating Burton. But, as discussed above, viewing Simmons's statement in the light most favorable to Burton's claim, it is not reasonable to infer that Simmons meant that *Detective Hobbs* coerced him, or even that he was coerced with respect to the identification procedure.[6] The record reflects that on June 11 Simmons initiated contact with Detective Hobbs, "want[ing] to talk to Homicide detectives" who were investigating Burton's shooting. Simmons told Detective Hobbs that he might be able to identify the shooter if he saw a picture of him, then he selected Burton from the four-photo array. We agree with the district court that "there is no evidence that . . . Simmons was encouraged to select [Burton] in the photographic array[] . . . as the shooter." *Burton*, 2012 WL 1933761, at *20.

---

[6]Simmons never claimed that he was coerced into selecting Burton's photo from a photo array. Rather, his testimony during the state habeas proceeding was that "[he] was coerced by the prosecuting attorney and the arresting officer." He testified that "[t]he prosecuting attorney[,] I think his name is Kowosky (phonetic sp)" was "telling [him] what to say."

C. *Conspiracy Claim*

Burton argues that he has presented ample evidence from which a jury could find that the defendants conspired to deprive him of his constitutional rights.

> To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). The plaintiff is additionally required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim. *Id.*

*White*, 519 F.3d at 814.

> For a claim of conspiracy under Section 1983, the plaintiff need not show that each participant knew "the exact limits of the illegal plan . . . ," but the plaintiff must show evidence sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights. *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996). "The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." *Id*. Because "the elements of a conspiracy are rarely established through means other than circumstantial evidence, and summary judgment is only warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided. The court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy." *Westborough Mall, Inc. v. City of Cape Girardeau*, 693 F.2d 733, 743 (8th Cir. 1982).

*Id.* at 816 (alteration in original).

Viewing the evidence in the light most favorable to Burton's claim, we find no evidence to support a reasonable inference that any of the defendants conspired to frame Burton for Ball's murder or otherwise to deprive him of his constitutional rights. Again, we agree with the district court's finding:

> At best, [Burton] has established that, based on information learned during the investigation into Ball's murder, the officer Defendants mistakenly believed [Burton] to be the murderer. [Burton] has failed, however, to establish a genuine issue of material fact whether he was deprived of a fair trial; consequently, his conspiracy claims fail.

*Burton*, 2012 WL 1933761, at *22.

### D. *Monell Claims Against the Board*

Burton's first amended complaint asserted that the individual defendants' conduct "resulted from certain improper customs and policies of the St. Louis Board of Police Commissioners." But "[i]n order for municipal liability to attach, individual liability must first be found on an underlying substantive claim." *Cooper v. Martin*, 634 F.3d 477, 481–82 (8th Cir. 2011) (quotation and citation omitted). Here, none of the individual defendants are liable on Burton's § 1983 claims, so Burton's claims against the St. Louis Board of Police Commissioners necessarily fail.

## III. *Conclusion*

Because we find that Burton has shown no genuine issue of material fact with respect to his § 1983 claims, we affirm the judgment of the district court.

______________________________